Keating, J.
In February of 1964, appellant, Aimcee Wholesale Corporation, bought some $100,000 in merchandise from respondent, Tomar Products, Inc. The contract, a form purchase order, contained a broad arbitration clause to the effect that ‘ ‘ Any controversy or claim arising out of or relating to this *624 contract or the breach thereof ” would be submitted to arbitration.
In August of 1965, Aimcee sought arbitration of a claim for $26,870.61 based upon allegations that the merchandise shipped was defective and that certain advertising allowances had not been paid. At about that time, Aimcee had been sued by Tomar in the Supreme Court, Monroe County, based upon an alleged breach of the same agreement. Aimcee also demanded that this claim be submitted to arbitration.
Tomar agreed to arbitration and served an answer in which it set up as a first counterclaim the cause of action then pending in the courts.
A second counterclaim, however, was also interposed asserting that Aimcee had unlawfully exacted a discriminatory price reduction in violation of the Bobinson-Patman Act (U. S. Code, tit. 15, § 13) and of the Donnelly Act (General Business Law, § 340, subd. 1). Tomar asked $15,000 in treble damages.*
Thereafter, Aimcee moved for an order staying arbitration of this second counterclaim. Tomer consented to the stay with respect to the alleged violation of Federal law, but resisted the stay as to the Donnelly Act claim.
Special Term denied Aimcee’s application, contending that the antitrust claim was related to the contract and was, therefore, arbitrable.
The Appellate Division unanimously affirmed (26 A D 2d 915) but went off on a different ground. It agreed that Tomar or Aimcee could resist arbitration on the ground that the contract including the arbitration clause was infected with illegality but, the court said, since Aimcee did not deny that there was a valid agreement to arbitrate, it could not object to any particular claim arising out of the parties’ contractual dealings (supra, p. 916).
Leave to appeal was granted by this court. We conclude that there should be a reversal here and that the motion for a stay should have been granted. The enforcement of our State’s antitrust policy cannot be left to commercial arbitration, which serves a vital and constructive role in the business world, but is not a fit instrument for the determination of antitrust controversies which are of such extreme importance to all of the people of this State.
*625 It will be assumed that the broad language of the arbitration clause embraces even antitrust claims although it is nothing less than a fiction to assume that the parties contemplated or even conceived of the possibility that the form arbitration clause on Aimcee’s purchase order constituted an authorization for an arbitrator to decide whether or not Aimcee had violated the antitrust law of the State of New York (General Business Law, art. 22).
The Appellate Division’s analysis that a party desiring arbitration cannot at the same time seek to limit the scope of an arbitration is unsatisfactory. The opinion concedes that if Tomar had resisted Aimcee’s demand for arbitration, alleging that the agreement was so tainted by illegality that the agreement to arbitrate was nullified, Tomar could have had a trial before the court on that issue (Durst v. Abrash, 22 A D 2d 39, affd. 17 N Y 2d 445). We do not view the problem here so narrowly. The fundamental issue here is the appropriateness of arbitration for the consideration of antitrust problems. This question persists no matter in what procedural context the issue arises in arbitration. Our decision cannot properly turn on the happenstance of who initiates the litigation or arbitration.
New York’s antitrust law represents a public policy of the first magnitude. By its very terms, subdivision 1 of section 340 of the General Business Law declares every contract, agreement or conspiracy whereby a monopoly is or may be established or which in any way enervates free competition to be “ against public policy, illegal and void.” Penal sanctions are provided for in section 341 of the General Business Law. Both because of the importance of the policy and the clandestine nature of the violations, the Attorney-General is empowered to investigate alleged violations and to seek injunctive relief (General Business Law, § 342). In addition, civil actions to recover damages by injured parties are authorized (General Business Law, § 340, subd. 5). There is thus a complete panoply of sanctions and civil relief.
It is also significant that, because of the public interest involved in Donnelly Act suits, in 1959 a statutory requirement was added that the Attorney-General be given notice of all civil actions brought by private parties under article 22 (General Business Law, § 340, subd. 5; L. 1959, ch. 226).
*626 The importance of our State’s antitrust policy is reflected in our decision in Manhattan Stor. & Warehouse Co. v. Movers Assn. (289 N. Y. 82 [1942]). We there held that our courts would not adjudicate on a stipulated set of facts whether a particular agreement violated the State’s antitrust law since to do so might result in a decision on a question of law of widespread significance on the basis of erroneous facts and without the participation of the representatives of the public interest. The sensitivity of the court to the possibility of feigned controversies on an issue of such pervasive importance was but a reflection of the strength of the public policy codified in the Donnelly Act.
The importance of antitrust laws in our nation’s economic system was stated most forcefully by the Supreme Court in Northern Pac. Ry. Co. v. United States (356 U. S. 1, 4-5): “ The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits ‘ Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States.’ ”
Section 340 of our General Business Law, the language of which is almost a copy of section 1 of the Sherman Act, represents an equally strong public policy in favor of free competition for New York.
We come then to our principal conclusion here, which is that the enforcement of our State’s antitrust policy should not be left within the purview of commercial arbitration.
Arbitrators are not bound by rules of law and their decisions are essentially final. Certainly the awards may not be set aside for misapplication of the law (CPLR 7511). Even if our courts were to review the merits of the arbitrators ’ decision in antitrust cases, errors may not even appear in the record which need not be kept in any case. More important, arbitrators are not obliged to give reasons for their rulings or awards. Thus our *627 courts may be called upon to enforce arbitration awards which are directly at variance with statutory law and judicial decision interpreting that law. Furthermore, there is no way to assure consistency of interpretation or application. The same conduct could be condemned or condoned by different arbitrators.
If the arbitrators here should decide wrongly that the goods were or were not defective, the injustice done is essentially only to the parties concerned. If, however, they should proceed to decide erroneously that there was or was not a violation of the Donnelly Act, the injury extends to the people of the State as a whole. To illustrate, if Tomar is correct in its claim that the rebate here violates the Donnelly Act, and the arbitration panel should deny the claim, then in effect the arbitrators have permitted Aimcee to receive an unjustifiable price reduction which weakens the position of Aimcee’s competitors. Conversely, if Tomar is incorrect in its contention, but the arbitrators should rule in its favor, then the award may be passed on to the consumer in the form of higher prices.
Thus the issue which the arbitrators will be called upon to decide transcends the private interests of the parties. It is not simply that arbitrators can impose unnecessarily restrictive or lenient standards. The evil is that, if the enforcement of antitrust policies is left in the hands of arbitrators, erroneous decisions will have adverse consequences for the public in general, and the guardians of the public interest, the courts, will have no say in the results reached. To paraphrase the court’s language in the Manhattan Stor. & Warehouse case, the parties will obtain a decision here on a matter of moment to the public at large, although the State is not a party to the proceedings, and no party to the proceedings is authorized to defend the interests of the public (289 N. Y. 82, 89).
In this connection, it is pertinent to ponder what application will be given to the statutory requirement that notice of all Donnelly Act claims shall be given to the Attorney-General if these claims are permitted to go to arbitration. There is no reason to assume that the Attorney-General will be less interested in any alleged violations that are submitted for arbitration. Yet, it is inconceivable that the Attorney-General would seek to vindicate the public interest before a private arbitration panel.
*628 It is, therefore, evident that a judicially controlled system of awarding civil damages for violations of the Donnelly Act is a necessary and vital part of the statutory scheme.
Thus, the decision below is not in accord with the fundamental assumptions of Matter of Exercycle Corp. (Maratta) (9 N Y 2d 329 [1961]) which the Appellate Division cited in support of its position. Underpinning Matter of Exercycle is the thought that the ordinary rules of common-law illegality involve defenses to which parties to a business agreement should not be bound. “No statute or public policy, as reflected in a legislative act, is here involved * * * and, absent one or the other, it has long been firmly established that arbitrators may disregard the strict and traditional rules of law ” (supra, p. 335).
Antitrust claims cannot be co-opted into the category of common-law rules voiding contracts for lack of consideration or mutuality and treated in a similar manner. When one contrasts the provisions of article 22 of the General Business Law with the lack of any powerful statutory scheme for voiding contracts which violate common-law rules of illegality, the inappropriateness of arbitration for antitrust claims becomes apparent. For example, the common-law requirement of consideration has been weakened by statutory modification because we now consider the traditional rules harsh. (See General Obligations Law, § 5-1109.) On the other-hand, the common-law rule against restraints of trade has been reinforced by statute, bringing within the orbit of proscribed conduct acts which in an earlier day would have been thought perfectly proper and acceptable.
The realities of the commercial arbitration process bolster the conclusion that commercial arbitration is not a proper mechanism for a determination as to whether the price rebate here was discriminatory and violated the Donnelly Act. Arbitrators are often businessmen chosen usually for their familiarity with the practices of a particular industry or for their expertise with the real issues in dispute, which are almost always unrelated to antitrust claims. This problem is aggravated by the fact that the enforcement of the State’s antitrust policy has often been a by-product of Federal enforcement. Thus, even if we were to assume that we have knowledgeable arbitrators, who would willingly and earnestly seek to follow judicial precedent, we cannot ignore the fact that many of the most impor *629 tant issues in antitrust law, including specifically those in this case, have never been resolved definitively under New York law. This is shown by the fact that it has never been determined whether price discrimination would violate the Donnelly Act.
Moreover, we cannot overlook the fact that many undeserving litigants are awarded damages in antitrust cases. Arbitrators are more likely to give more consideration to equitable notions such as waiver, estoppel and in pari delicto. Every time this is done, however, the deterrent effect of the law on antitrust violations is severely diminished.
The comment of the late Judge Clark in his dissenting opinion in Wilko v. Swan (201 F. 2d 439, 445 [2d Cir.]), whose position was ultimately sustained by the Supreme Court (346 U. S. 427), pointing out the dangers of permitting commercial arbitration to extend its reach into areas of grave public policy, is most relevant here: “ Commercial arbitration has been highly successful in bringing a businessman’s adjudication to business questions. But it would be vastly unfortunate if it became usable as a device to blunt or break social legislation.”
Thus, it must be recognized that through the use of economic power and contracts of adhesion, containing broad arbitration clauses, antitrust violators may be able to insulate their transgressions of the antitrust law from judicial scrutiny. The opportunity for abuse is apparent. Under various guises, an industry, while nominally assuring obedience to the State’s antitrust law, may in reality be establishing and enforcing entirely unacceptable practices.
We have often held that the broadest of arbitration agreements cannot oust our courts from their role in the enforcement of major State policies, especially those embodied in statutory form (Durst v. Abrash, 22 A D 2d 39, affd. 17 N Y 2d 445, supra [usury laws]; Matter of Knickerbocker Agency [Holz], 4 N Y 2d 245 [liquidation of defunct insurance companies]; Matter of Kingswood Mgt. Corp. [Salzman], 272 App. Div. 328 [claim under Federal Emergency Price Control Act of 1942]; see, also, Wilko v. Swan, 346 U. S. 427, supra [claim under Securities Act of 1933]; Koven & Brother v. Local Union No. 5767, United Steelworkers of America, 381 F. 2d 196 [3d Cir.] [scope of discharge in bankruptcy]; contra, Fallick v. Kehr, 369 F. 2d 899 [2d Cir.] [scope of discharge in bankruptcy]; *630 8 Weinstein-Korn-Miller, N. Y. Civ. Prac., pars. 7501.15-7501.19). Recently, the Second Circuit in American Safety Equip. Corp. v. Maguire Co. (391 F. 2d 821) came to a conclusion similar to ours involving arbitration of a Federal antitrust claim (see, also, Silver cup Bakers v. Fink Baking Corp., 273 F. Supp. 159, 162-163 [S. D. N. Y.] [dictum]).
All these reasons compel us to determine that where antitrust considerations are imbedded in the issues in dispute, they ought not to be resolved by privately appointed arbitrators, and our courts cannot abdicate their control over antitrust policy. By removing antitrust claims from the scope of arbitration, we do not intend to demean the arbitration process. If anything, its proper role in settling the practical business problems of the everyday business world will be enhanced.
The order of the Appellate Division should be reversed and the appellant’s application for a stay of arbitration of respondent’s claim under article 22 of the General Business Law should be granted, with costs.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan and Jasen concur with Judge Keating ; Judge Breitel taking no part.
Order reversed, with costs, and matter remitted to Special Term for further proceedings in accordance with the opinion herein.

 New York law has no provision for treble damages in antitrust claims.