## A. & E. PLASTIK PAK CO., Inc., Appellant,

v.

## MONSANTO COMPANY, Appellee.

No. 21420.

United States Court of Appeals
Ninth Circuit.

June 5, 1968.

Jack Corinblit (argued), Los Angeles, Cal., Meyer Berkowitz, Beverly Hills, Cal., for appellant.

Gordon F. Hampton (argued), Don T. Hibner, Jr., of Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., A. Donham Owen of Owen, Wickersham & Erickson, San Francisco, Cal., for appellee.

Before CHAMBERS and MERRILL, Circuit Judges, and SOLOMON, District Judge.

MERRILL, Circuit Judge:

This appeal is taken pursuant to 28 U.S.C. § 1292(a) (1), from an interlocutory order denying a temporary injunction.

*Background*

Until December 3, 1963, Monsanto held a patent on an extremely clear, durable type of plastic sheet known as "biaxially oriented polystyrene sheet" and, in the trade, called "OPS". It remains the major U. S. supplier of this sheet. Soon after the expiration of its patent, A. & E., a producer of finished products from this type of plastic sheet, began attempts to develop a plant to make OPS for itself, using information disclosed by the patent.

In April, 1964, A. & E. hired away from Monsanto one of the latter's engineers, Merlin Evans, who had worked for Monsanto since graduation from college seven years earlier. In the course of his employment he had been intimately involved in OPS research and development and had had full access to Monsanto's latest technology in this field. Monsanto held an employment contract with Evans under which he had agreed never to disclose "any secret or confidential information or matter of the company." Monsanto, fearing that Evans would disclose confidential technology to A. & E., wrote A. & E. warning that it would take legal action if such information were used by A. & E. in setting up its OPS process.

A. & E. thereupon suspended installation of the sheet process in its plant and efforts were begun to settle the issue. On December 22, 1964, a written agreement was entered into by which Monsanto granted A. & E. a license to use its technology as known to Evans, apparently to the extent necessary to provide OPS for use in the manufacture of thermoformed articles. A. & E. agreed to pay royalties for a period of ten years. Evans was released from his obligation of secrecy.

Apparently for the purpose of allowing A. & E. the economies of large-scale production while refraining from competition with Monsanto in the sale of the sheet itself, the agreement also provided that Monsanto would purchase from A. & E. five million pounds of OPS over the first three years after its production was begun by A. & E. The exact terms of this agreement were not specified and the parties were unable subsequently to agree upon further clarification. In September, 1965, A. & E. notified Monsanto that it was prepared to deliver sheet pursuant to the terms of the agreement. Monsanto then repudiated its obligation to purchase and A. & E. thereupon began sale of the sheet on the open market in competition with Monsanto.

The agreement between the parties provided for arbitration of all disputes "arising out of or relating to" the agreement. On March 4, 1966, Monsanto served a demand for arbitration of the following issues: (1) whether A. & E. had breached its licensing agreement with Monsanto, and (2) whether Monsanto was justified in repudiating its commitment to purchase five million

pounds of OPS from A. & E. An answering statement filed by A. & E. presented as issues: (1) whether it had agreed not to sell the OPS it produced to third parties, and (2) whether trade secrets or "know-how" existed which could be imparted to it by Merlin Evans and form the subject of a valid license.

While A. & E. initially appeared to accept arbitration, and participated in the selection of arbitrators, on June 27, 1966, just before arbitration was to begin, it filed this suit in the District Court for the Central District of California claiming that if the agreement were construed as Monsanto wished it to be it would violate the Sherman Act as an attempt to monopolize the market in OPS and restrain trade in that product. As relief it sought, in part, permanent and temporary injunctions enjoining Monsanto from proceeding with arbitration.

Upon motion of A. & E. the District Court entered its order denying temporary injunction. It is from this order that appeal is taken.

### Motion to dismiss

At the outset we are faced with Monsanto's motion to dismiss the appeal for lack of appellate jurisdiction. Monsanto contends that the order denying a temporary injunction is not an appealable order under 28 U.S.C. § 1292(a)(1); [1] that it was not in truth an injunction which was sought but a "stay" of arbitration; and that the order was a mere step in the controlling of litigation before the court. In support of its contention Monsanto relies upon Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80 (2d Cir. 1961), cert. denied, Dawson v. Lummus Co., 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962).

We cannot agree. This is not a case of a court's staying or refusing to stay its own hand in deference to proceedings going forward in another forum.[2] The order was not an exercise by a court of its inherent power to control its own proceedings. Here the court was asked (and declined) affirmatively to interfere with proceedings in another forum; to exercise its equity powers to halt action of its litigants outside of its own court proceedings—the classic form of injunction. That arbitration is not a mere extension of court proceedings but involves a separate tribunal seems clear from Bernhardt v. Polygraph Co. of America, 350 U.S. 198, 202–203, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

The motion to dismiss is denied.

### Merits of the appeal

The essence of A. & E.'s complaint of a Sherman Act violation is set forth in paragraph V(a) of its first cause of action:

"MONSANTO attempted to extend its patent monopoly, although the patent had already expired, by asserting in bad faith as against any potential competitor who employed MONSANTO personnel, including A. & E., that what had in fact been a

---

1. "The Courts of Appeals shall have jurisdiction of appeals from:
   (1) Interlocutory orders of the district courts of the United States * * * granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions * * *."

2. We may note that had the District Court, instead of declining to "stay" arbitration at the behest of A. & E., chosen instead, at the behest of Monsanto, to order its own proceedings stayed pending arbitration, the stay order would have been deemed an injunction and appealable. American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821 (2d Cir. 1968). The appeal from a stay by a court of its own proceedings involves one in the mysteries of Enelow v. New York Life Ins. Co., 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440 (1935), with which this court has previously struggled. Alexander v. Pacific Maritime Ass'n, 332 F.2d 266 (9th Cir.), cert. denied, 379 U.S. 882, 85 S.Ct. 150, 13 L.Ed.2d 88 (1964); Chronicle Publishing Co. v. National Broadcasting Co., 294 F.2d 744 (9th Cir. 1961). See Note, Appealability of Stay Orders in the Federal Courts, 47 Minn. L.Rev. 1099 (1963).

patented machine or process was now a 'trade secret'. This assertion by MONSANTO was in bad faith for the purpose of frightening and eliminating any competition in the manufacture of OPS because MONSANTO knew that all of the elements of the manufacture of OPS were disclosed in Patent No. 2,412,187, or were the subject of engineering skill which was not capable of and was not in fact the subject of proprietary ownership by MONSANTO."

Further, A. & E. specifies as an antitrust violation the very promise on which Monsanto seeks arbitration: the alleged promise of A. & E. not to compete in public sales of OPS.[3]

Upon this appeal the question is whether, considering the underlying nature of the controversy, it was abuse of discretion for the District Court, by refusing to grant the requested injunction, to defer to resolution of factual disputes by the arbitration forum. A. & E.'s contentions in asserting abuse of discretion may be stated as follows:

1. That the contract upon its face is invalid under the Sherman Act and that this invalidity voids the agreement to arbitrate.

2. That if issues remain to be decided upon which the validity of the contract will depend these issues are for the court and not the arbitration panel.

3. That in any event where the existence of a valid arbitration agreement is in dispute this issue should have precedence and should be first resolved before resort is had to arbitration.

■■ We deal with these contentions in order.[4]

### 1. *Validity of the contract on its face*

In Ring v. Spina, 148 F.2d 647, 160 A.L.R. 371 (2d Cir. 1945), it was held that where price fixing, a per se violation of the antitrust laws, appeared prima facie from the face of the agreement no purpose would be served by arbitration until a District Court determination of its validity had first been had. The court stated at page 650:

"We think we must hold that there is showing prima facie, of an agreement in restraint of trade * * *."

■ The agreement between Monsanto and A. & E., on its face, appears to be a license of technology or "know-how,"[5] to which restraints of competition are attached as conditions of the license. Thus, on its face, it does not appear to be an agreement between

---

3. A. & E. also charges Monsanto with fraud in its promise to purchase OPS from A. & E., contending that it was a promise Monsanto intended never to keep. A. & E. prays for $75,000 compensatory and $75,000 punitive damages in this respect.

4. A. & E. also contends that because Monsanto repudiated its obligation under the agreement to purchase OPS from A. & E., it is precluded from seeking to enforce the arbitration clause. In Riess v. Murchison, 384 F.2d 727 (9th Cir. 1967), we found that under California law repudiation of a contract by one party does not work a forfeiture by that party of its right to seek arbitration under its terms. A. & E. and Monsanto have stipulated that California law should govern the interpretation and construction of their agreement. We also find no merit in Monsanto's contention that A. & E. is foreclosed from challenging the arbitrability of the issues submitted to arbitration because it participated in the selection of arbitrators before contesting the propriety of the proceedings. A. & E. at all times reserved its right to refuse to arbitrate, attempted to have the proceedings abated while it filed its suit in the District Court, and was forced to participate in the selection of arbitrators because failure to do so would have resulted in the arbitration of all issues (assuming that it failed to obtain an injunction) by arbitrators selected by Monsanto alone.

5. Know-how has been defined to include "accumulated technical experience and skills which can best, or perhaps only, be communicated through the medium of personal services." Creed & Bangs, Know-How Licensing and Capital Gains, 4 Patent, Trade-Mark and Copyright J. of Research and Education 93 (1960).

competitors not to compete, for absent the licensed know-how, A. & E. is in no position to compete.

The holder of a patent can validly license it to others on the condition that they use it only for certain purposes. General Talking Pictures Corp. v. Western Electric Co., 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81 (1938). A patent is a legal monopoly and any waiver of the monopoly expands rather than diminishes its availability to the public.

To a certain extent the same is true of the licensing of trade secrets or know-how. Know-how, unlike a patent, confers upon the one who enjoys it no universal power to exclude others and its value is gone when the technology it encompasses is gained by the experience of others. However, "it confers upon its possessor the exclusive, although perhaps temporary, right to utilize it." MacDonald, Know-How Licensing and the Antitrust Laws, 62 Mich. L.Rev. 351, 354 (1964). As to the imposition of restraints as a condition to know-how licensing, the author of the above article concludes:

" * * * so long as restraints are imposed solely upon those know-how licensees who have not discovered and cannot easily obtain the technology for themselves, the restraints should be valid, if reasonable. To the uninitiated licensee, at least, the know-how which is granted is figuratively a type of 'property,' and the restraints imposed on him are less burdensome than the competitive disability posed by his unfamiliarity with the secret techniques.

* * * the license itself, like a patent license, is a partial release of [a] monopoly position rather than the imposition of an additional restraint upon trade and commerce in the products made by the use of the know-how."

Macdonald, supra, at 355, 358.

The critical question in an antitrust context is whether the restriction may fairly be said to be ancillary to a commercially supportable licensing arrangement, or whether the licensing scheme is a sham set up for the purpose of controlling competition while avoiding the consequences of the antitrust laws.

A. & E. contends that the latter is the case here, relying upon United States v. Imperial Chemical Industries, 100 F. Supp. 504 (S.D.N.Y.1951); United States v. Timken Roller Bearing Co., 83 F.Supp. 284 (N.D.Ohio 1949), aff'd, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); United States v. General Electric Co., 82 F.Supp. 753 (D.N.J.1949).

In these cases complicated world-wide networks of cross-licensing agreements were struck down as subterfuges enabling the participants to divide markets and fix prices while avoiding antitrust laws. The courts found a lack of any true trade secrets or that what secrets existed were not sufficiently substantial to support restraints of such magnitude. The parties' intent, principally to restrain competition, was regarded as a critical factor.

If the agreement between Monsanto and A. & E. is to be found invalid for similar reasons, such invalidity is not disclosed prima facie from the face of the contract. It will depend upon the existence and the extent of know-how or technology exclusively possessed by Monsanto and within the knowledge of Evans and whether the substance of such technology may fairly be said to support ancillary restraints of the kind here involved.

The question remains whether such issues may be submitted to arbitration.

## 2. *Propriety of arbitration as a forum for resolution of disputes*

Where the validity of a contract is challenged upon the ground of fraud, the issue of fraud is a proper subject of arbitration. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). However, whether a contract is valid under the federal antitrust

laws is not an arbitrable issue. American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821 (2d Cir. 1968). See also Aimcee Wholesale Corp. v. Tomar Products Inc., 21 N.Y.2d 621, 289 N.Y.S.2d 968, 237 N.E.2d 223 (1968) (state antitrust claims not arbitrable).

Monsanto asserts that the latter issue is not here submitted to arbitration; that following arbitration the contract, as construed by the arbitrators, will be back before the District Court for its determination as to validity under the antitrust laws.

■ We agree with Monsanto as to three of the issues submitted to arbitration: (1) whether A. & E. had promised not to sell OPS in competition with Monsanto; (2) whether A. & E. had broken that promise; (3) whether Monsanto was justified in repudiating its commitment to purchase OPS from A. & E. These are issues as to which the parties could stipulate without offense to the public interest and as to which they can as well agree upon a method of resolving disputes. To A. & E.'s contention that it will lose its right to jury trial on these issues the short answer is that it has waived this right by agreeing to arbitration. Antitrust issues in such a case as this, which does not involve alleged conspiracy, are not presented until the facts are known as to what the parties have promised each other or the action to which they are presently bound.

■ The same cannot be said of the fourth issue presented for arbitration: the existence and extent of technology within the knowledge of Evans which Monsanto can rightfully claim as privately controlled. This (together with Monsanto's purpose) is the crucial factual antitrust issue, for without such technology as a basis no restriction on competition could be valid as an ancillary restraint. Public interest attaches to the ascertainment of the truth as to this issue. Such issues the parties cannot, by stipulation or otherwise, exclude from the area of judicial scrutiny and determination.

We conclude that it was abuse of discretion for the court to make this issue available for arbitration.

3. *Propriety of the court's choice of order of factual determination*

■ The court has chosen to await the results of arbitration before proceeding to determination of the validity of the contract in A. & E.'s antitrust suit. We cannot say that this constituted abuse of discretion.

In Ring v. Spina, supra, in finding a stay pending arbitration to be abuse of discretion, the court stated (148 F.2d at 654):

"No good purpose will be served by forcing the parties to the time and expense of arbitration while this question remains unsettled; and serious legal problems may develop if an arbitration is had, and thereafter the contracts are held invalid."

In Wyatt Earp Enterprises v. Sackman, Inc., 157 F.Supp. 621 (S.D.N.Y. 1958), the court, in rejecting a stay, found a strong case for invalidity and noted that proceeding to arbitration would merely add to the costliness and delays of litigation that arbitration is supposed to eliminate.

Invalidity is not so clear here. The court understandably could wish to know the precise dimensions of the parties' agreement before undertaking to decide its validity.

We do by our decision, however, drastically limit the area open to arbitration and this may well affect the decision of the District Court as to the order and the forum in which factual determination should be made. The order denying temporary injunction must in any event be set aside for lack of necessary limitation. Reconsideration of the entire matter, *sua sponte* or upon application by either party, should now be available.

Reversed and remanded with instructions that the order denying temporary injunction be set aside and for further proceedings. No costs are allowed.