**LAKE COMMUNICATIONS, INC.,**
**Plaintiff-Appellant,**

v.

**ICC CORPORATION, a Korean corporation, Kologel Co., Ltd., a California corporation, Allways International, Inc., an Illinois corporation, Defendants-Appellees.**

**ALLWAYS INTERNATIONAL, INC., an Illinois corporation, Kologel Co., Ltd., a California corporation, Counterclaimants-Appellees,**

v.

**LAKE COMMUNICATIONS, INC., Leo Kassin, Counterclaimants, Defendants-Appellants.**

**No. 81–5359.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1981.

Decided Aug. 2, 1984.

Mark B. Scott, San Francisco, Cal., for plaintiff-appellant.

Michael J. Dennis, Los Angeles, Cal., Thomas E. Johnson, Chicago, Ill., for defendants-appellees.

Before BROWNING, Chief Judge, FLETCHER, Circuit Judge, and VON DER HEYDT,* District Judge.

BROWNING, Chief Judge:

This is an appeal from an order of the district court staying litigation of certain pendent claims and counterclaims in an antitrust suit and instructing the parties to arbitrate these claims.

Lake Communications, Inc. (Lake), an Illinois corporation, entered into agreements with ICC Corporation (ICC), a Korean corporation, under which ICC was to purchase electronic products manufactured to Lake's specifications by Korean companies and resell them to Lake for marketing in the United States. After substantial shipments had been made, received, and paid for, a disagreement arose. Lake filed this action against ICC and its wholly owned American subsidiaries, Allways International, Inc. (Allways) and Kologel Company, Ltd. (Kologel), alleging violations of section 1 of the Sherman Act, 15 U.S.C. § 1, section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15

U.S.C. § 13, and provisions of California statutory and common law.

According to Lake, ICC agreed to act exclusively for Lake in purchasing electronic equipment from Korean manufacturers, and to ship that equipment to Lake through Kologel, ICC's "Chicago branch." Lake claims it gave ICC confidential information regarding the identity and purchasing requirements of its customers. Lake also furnished ICC with Lake's trademarks and trade names to be permanently affixed to each unit, and with Lake's distinctive packaging. ICC was to provide quality control by inspecting and testing the electronics in Korea prior to shipment. Lake had the exclusive right to market the electronics in the United States. In return, ICC was to receive a commission of one percent of the purchase price.

The first three counts of Lake's complaint allege federal antitrust claims. Count I alleges that ICC, Allways, and Kologel conspired to eliminate Lake as a competitor in the sale of electronics in violation of section 1 of the Sherman Act by: (1) intentionally shipping defective electronics to Lake; (2) selling electronics to customers of Lake at prices lower than those charged Lake; (3) forming Tancredi, a division of Kologel, to sell to Lake's customers electronics infringing Lake's trademarks and designs; (4) wrongfully appropriating Lake's customers by unfair and predatory practices; and (5) wrongfully disparaging Lake and its electronics.

Count II realleges the conspiracy to eliminate Lake as a competitor, but by different means: (1) causing Kologel to distribute electronics with functional and nonfunctional features identical to Lake's; (2) causing Kologel to market electronics under the name Tancredi that were confusingly similar to Lake's; and (3) deliberately infringing Lake's trademarks with intent to pass off Tancredi electronics as Lake electronics. Count III alleges that in violation of section 2(a) of the Clayton Act as amended

* Honorable James A. von der Heydt, Chief Judge, United States District Court for the District of Alaska, sitting by designation.

by the Robinson-Patman Act, ICC and Kologel sold electronics to Lake's customers at prices lower than those at which they sold electronics of the same kind and quality to Lake.

The remaining thirteen counts allege various state claims. The first four allege violations of state antitrust and unfair competition laws. Counts IV, V, and VI incorporate the factual allegations of Counts I, II, and III and charge violations of California's Cartwright Act, Cal.Bus. & Prof.Code §§ 16700–16758, and California's Unfair Trade Practices Act, Cal.Bus. & Prof.Code §§ 17000–17101. Count VII incorporates the factual allegations of Counts I, II, and III and charges common law unfair competition.

Counts VIII through XVI allege various non-antitrust common law causes of action: breach of contract, breach of fiduciary and common law duties, breach of warranty, deceit, malicious interference with contract, loss of prospective economic advantage, trade mark infringement, and indemnity.

ICC filed a motion to dismiss for lack of personal jurisdiction.[1] Allways and Kologel counterclaimed against Lake and Leo Kassin, Lake's president, to recover the purchase price or value of electronics delivered to Lake, alleging breach of contractual and common law duties and nonpayment for goods received. Both also sought damages for abuse of process, alleging Lake's antitrust claims were groundless, and that Lake instituted this litigation in order to preempt ICC's anticipated collection suit in the state courts in Illinois, where Lake, Allways, and Kassin resided. This successfully postponed ICC's recovery pending resolution of this litigation.

Allways and Kologel moved to dismiss the action or to stay further proceedings pending arbitration pursuant to a provision printed on the back of six sales notes between Lake and ICC. The provision stated

that any unresolved dispute "arising out of or relating to this contract or the breach thereof ... shall be arbitrated in the Republic of Korea, under the rule of the Republic of Korea and in accordance with the rules of procedure of the Korean Commercial Arbitration Association."

The district court denied the motion to dismiss, granted the motion to stay in part, and ordered Lake and ICC to proceed to arbitration. This appeal followed. On Lake's motion, this court stayed implementation of the district court's order.

### I. *Preliminary Matters*

#### A.

■ Appellees challenge our jurisdiction to review the district court's order. Lake's complaint seeks money damages and is primarily an action at law. The relief sought by appellees, a stay of the litigation pending arbitration, is equitable in nature. The district court order granting a partial stay is therefore appealable under 28 U.S.C. § 1292(a)(1) as an interlocutory order granting an injunction. *See Mediterranean Enterprises, Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1461–62 (9th Cir.1983); *ATSA of California, Inc. v. Continental Insurance Co.,* 702 F.2d 172, 173–74 & n. 2 (9th Cir.1983); *Wren v. Sletten Construction Co.,* 654 F.2d 529, 532–33 (9th Cir. 1981); *Varo v. Comprehensive Designers, Inc.,* 504 F.2d 1103, 1103 & n. 1 (9th Cir. 1974).

#### B.

■ The district court's order not only directed Lake and ICC to proceed to arbitration, but also stated that "any interested parties who wish to voluntarily participate" could do so. Allways indicated its intention to accept the invitation. Lake objects on the ground that only Lake and ICC are parties to the six sales notes, and Lake has not agreed to arbitrate with Allways. *See Moses Cone Memorial Hospital v. Mercu-*

---

1. The district court approved a stipulation of the parties deferring consideration of the motion to dismiss for lack of personal jurisdiction. The issue is therefore not before us. Lake's arguments that ICC waived any objection to personal

jurisdiction by its conduct in this litigation properly should be directed to the district court when the issue is raised in due course upon remand.

*ry Construction Corp.,* 460 U.S. 1, ——, 103 S.Ct. 927, 939, 74 L.Ed.2d 765 (1983). ICC offers a variety of theories upon which Allways may establish a right to arbitrate, but those that have substance require factual determinations the district court has not yet made. *See ATSA of California,* 702 F.2d at 176. Unless and until such determination is made, Allways' counterclaims against Lake cannot be referred to arbitration. The district court may, however, stay litigation of these counterclaims if it finds that course advisable in view of their interdependence with claims properly referred to arbitration. *Moses Cone Memorial Hospital,* 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23; *Sam Reisfeld & Son Import Co. v. S.A. Eteco,* 530 F.2d 679, 681 (5th Cir.1976).

### C.

■ Lake contends appellees waived any right to arbitration they may have had. Waiver of arbitration is not readily found. *Shinto Shipping Co. v. Fibrex & Shipping Co.,* 572 F.2d 1328, 1330 (9th Cir.1978). More is required than action inconsistent with an arbitration provision; prejudice to the party opposing arbitration must also be shown. *ATSA of California,* 702 F.2d at 175; *Shinto,* 572 F.2d at 1330.

ICC did not seek arbitration until more than a year after the complaint was filed, but ICC had not yet filed an answer. Moreover, shortly after suit was filed ICC submitted a motion to dismiss alluding to the arbitration provision in the sales notes and giving notice of ICC's intention to rely upon it. But even assuming ICC's actions were somehow inconsistent with its attempt to seek arbitration, Lake has shown

no prejudice. Lake argues that ICC initiated discovery, but only limited discovery has occurred, consisting primarily of the taking of the deposition of Lake's president.

### D.

■ Lake argues that ICC has no arbitrable claim against Lake because Allways paid ICC in full for the merchandise shipped to Lake, a fact said to be established by an affidavit of the president of Allways filed in support of a motion under 28 U.S.C. § 1404(a). This argument goes to the merits of ICC's claim rather than its arbitrability. Whether ICC's claim for payment is valid is for the arbitrator to decide. The Fifth Circuit rejected an argument analogous to Lake's in *City of Meridan, Mississippi v. Algernon Blair, Inc.,* 721 F.2d 525, 529 (5th Cir.1983).[2] Moreover, the fact that ICC may have been paid has no effect on ICC's right to invoke the arbitration clause in connection with Lake's claims against ICC relating to the contract.

### II.

The central issue is whether the district court abused its discretion in referring Lake's contract claims to arbitration and permitting discovery to continue on Lake's antitrust claims. *Applied Digital Technology,* 576 F.2d at 119; *Plastik Pak,* 396 F.2d at 716. The underlying question is whether the district court properly accommodated the conflicting congressional policies favoring resolution of private controversies by arbitration on the one hand, and, on the other, encouraging private suits to protect the public interests served by the antitrust laws. *See American Safety Equipment*

---

2. In *Algernon Blair, Inc.,* a general contractor and the City entered into a contract containing an arbitration clause. The general contractor sought arbitration of a claim for payment for extra work performed by a subcontractor. The City resisted on the ground that the general contractor could not recover on the subcontractor's claim. The court held the contractor's right to invoke arbitration for its claim was not extinguished by the fact that the subcontractor might have a claim against the contractor for the sums recovered. The court said, "Our sole function is to determine whether arbitration should be commenced; we play no part in determining the strength of claims and defenses presented." *Id.* at 529. Lake's assertion that ICC is not entitled to arbitration because ICC has been paid by Allways fails for similar reasons. That Allways may have a valid claim against ICC if ICC receives payment from Lake does not render ICC's claim non-arbitrable. The issue before the district court was whether the subject matter of the dispute was covered by the arbitration clause.

**1478**

*Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826–27 (2d Cir.1968).

 The court did not specify the particular issues that would be submitted to arbitration and those that would be subject to continued discovery and possible trial. Neither side asked the court to do so. Appellees argued all claims were subject to arbitration and all court proceedings should be either dismissed or stayed until arbitration was completed.[3] Lake argued, on the other hand, all claims should be tried in court because all claims were permeated with antitrust issues.

 The court adopted a middle position. The court rejected appellees' suggestion that antitrust issues were arbitrable, and allowed discovery to continue on these issues and any other issues not within the arbitration agreement. ICC was directed to submit to arbitration issues ICC believed were within the arbitration agreement. Lake was authorized to pursue discovery on antitrust issues not within the arbitration agreement. The parties were required to file joint reports with the court at 60-day intervals regarding the status of the arbitration proceedings. The court announced its intention to resolve conflicts it anticipated would arise, and make such adjustments as appeared appropriate.

For the reasons that follow, this procedure appears to be a reasonable accommodation between the interests protected by the Federal Arbitration Act and those protected by the antitrust laws. We hold that adoption of the procedure was not an abuse of discretion.

The United States Arbitration Act, 9 U.S.C. §§ 1–208, ended "centuries of judicial hostility to arbitration agreements," and substituted in its stead a strong federal policy in favor of arbitration as a "prompt, economical and adequate solution of controversies." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974); *Wilko v. Swan*, 346 U.S. 427, 438, 74 S.Ct. 182, 188, 98 L.Ed. 168 (1953). The Arbitration Act recognizes arbitration clauses to be "valid, irrevocable, and enforceable," 9 U.S.C. § 2, and provides that in "any suit ... upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending ... shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement...." 9 U.S.C. § 3. Pertinent treaties also provide that arbitration agreements should be recognized and enforced.[4]

3. Appellees contended in the district court that under the decision in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), even antitrust claims must be arbitrated if they fall within an arbitration agreement in an international commercial contract. However, appellees did not appeal the district court's order permitting continued litigation of the antitrust claims. In any event, *Scherk* is not controlling here. The rationale for refusing to refer antitrust claims to arbitration does not apply to claims under federal securities laws. Krause, *Securities Litigation: The Unsolved Problem of Predispute Arbitration Agreements for Pendent Claims*, 29 DePaul L.Rev. 693, 705 (1980). Th~~e~~ nonarbitrability of antitrust claims stems from a variety of public policy considerations, including protection of the public interest in a competitive national economy. *Scherk* and its predecessor, *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), were concerned with protection of a right of action granted an individual under federal securities laws. Even though the international nature of the dispute may be a sufficient basis for enforcing an arbi-

tration agreement relinquishing an individual remedy granted by the federal securities laws, it is insufficient to override the strong public policies favoring judicial enforcement of the antitrust laws. *Soler Chrysler-Plymouth*, 723 F.2d at 166–68.

4. Article II of the Convention on Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, to which the United States and Korea are signatories, provides that "[e]ach contracting state shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them" (section 1); and that courts of each contracting party "shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed" (section 3). Similar objections are imposed by Article V(2) of the Treaty of Friendship, Commerce and Navigation Between the United States of America

On the other hand, the antitrust laws affect the basic structure of our society and serve significant public interests. Congress intended private suits by persons injured by violations of those laws to be a major means of enforcement. "A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest." *American Safety Equipment Corp.*, 391 F.2d at 826. Moreover, antitrust cases are usually complex "and the evidence extensive and diverse, far better suited to judicial than to arbitration procedures." *Id.* at 827. Commercial arbitrators, frequently drawn from the business community because their expertise in business matters makes them well suited to interpret commercial contracts, are ill-suited to safeguard the public interest in regulating the business community to preserve a competitive economy. *Id.*

 For these reasons courts have concluded Congress intended that antitrust claims be resolved by the courts, not by arbitrators. Accordingly, courts of appeals that have considered the problem have uni-formly recognized an implied exception to the Federal Arbitration Act barring submission of antitrust claims to arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 723 F.2d 155, 162–63 (1st Cir.1983); *University Life Insurance Co. v. Unimarc Ltd.*, 699 F.2d 846, 850–51 (7th Cir.1983); *Applied Digital Technology, Inc. v. Continental Casualty Co.*, 576 F.2d 116, 117 (7th Cir.1978); *N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.*, 532 F.2d 874, 876 (2d Cir.1976); *Varo v. Comprehensive Designers*, 504 F.2d at 1104; *Cobb v. Lewis*, 488 F.2d at 47; *Power Replacements, Inc. v. Air Preheater Co.*, 426 F.2d 980, 983–84 (9th Cir.1970); *A. & E. Plastik Pak Co. v. Monsanto Co.*, 396 F.2d 710, 715–16 (9th Cir.1968); *American Safety Equipment Corp.*, 391 F.2d at 827–28.[5]

Faithful to these rulings, the district court properly refused to dismiss the court proceedings and refer the entire dispute, including the antitrust claims, to arbitration.[6] The court's order did, in general terms, stay further court proceedings pending arbitration. However, the order also provided that discovery should continue "with respect to the antitrust items and any matters that do not fall within the

and the Republic of Korea, Nov. 28, 1956, 8 U.S.T. 2217, T.I.A.S. No. 3947 (1956).

**5.** Neither of the treaties applicable here (see note 4) requires a different result. The Treaty of Friendship, Commerce and Navigation Between the United States and Korea, Nov. 28, 1956, 8 U.S.T. 2217, T.I.A.S. No. 3947, Article V(2), provides in pertinent part:

Contracts entered into between nationals and companies of either Party and nationals and companies of the other Party, that provide for the settlement by arbitration of controversies, shall not be deemed unenforceable within the territories of such other Party merely on the grounds that the place designated for the arbitration proceedings is outside such territories or that the nationality of one or more of the arbitrators is not that of such other Party.

This provision is designed to place arbitration agreements involving nationals of either country on the same footing as domestic agreements. Domestic agreements cannot require arbitration of antitrust issues. Furthermore, Article XVIII expresses disapproval of "business practices which restrain competition, limit access to markets or foster monopolistic control, and which are engaged in or made effective by one or more private or public enterprises or by combination, agreement or other arrangement among such enterprises ...."

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, does not require referral of antitrust claims to arbitration. *Soler Chrysler-Plymouth*, 723 F.2d 162–66.

**6.** We interpret this ruling as applying, and properly so, to state as well as federal antitrust claims. "Since the federal and state antitrust laws protect the same interests of society, we do not perceive that Congress intended, by enacting the Federal Arbitration Act, to require arbitration under the terms of a contract which is challenged as being in violation of the state antitrust laws." *United Nuclear Corp. v. General Atomic Co.*, 93 N.M. 105, 597 P.2d 290, 312 (1979). *See also Aimcee Wholesale Corp. v. Tomar Products, Inc.*, 21 N.Y.2d 621, 289 N.Y.S.2d 968, 237 N.E.2d 223, 225 (1968).

provisions of the arbitration agreement." The court said that whether the non-arbitrable claims would be tried before arbitration was completed would depend upon the progress made.

Lake's principal contention on appeal is that arbitration of any of the claims is inappropriate because all of the claims asserted are "permeated" by antitrust issues. Lake relies on the "permeation doctrine," the essence of which is that a court should stay arbitration of contract claims if the antitrust and contract issues are so intertwined that neither can be resolved separately and the antitrust claims appear likely to succeed. *See Cobb v. Lewis,* 488 F.2d 41, 50 (5th Cir.1974).

For the reasons that follow, we conclude the district court did not abuse its discretion by concluding that the "permeation doctrine" does not require complete foreclosure of arbitration in this case.

The agreement to arbitrate is found in an international commercial contract and designates a foreign forum and governing law for resolution of disputes under that contract, a circumstance strongly favoring arbitration. *See Scherk v. Alberto-Culver Co.,* 417 U.S. at 515–20, 94 S.Ct. at 2455–57. As the Court explained in *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 9, 92 S.Ct. 1907, 1912, 32 L.Ed.2d 513 (1972), "[t]he expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts.... We cannot have trade in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts."

The antitrust claims alleged in this case are relatively weak, diminishing the possibility that immediate and exclusive judicial intervention would be desirable. *See University Life Insurance,* 699 F.2d at 851–53; *see also N.V. Maatschappij Voor Industriele Waarden,* 532 F.2d at 876–77; *Applied Digital Technology,* 576 F.2d at 118. If the issues are intertwined and the antitrust claims appear to be facially strong— as for example, when the pleadings disclose a per se violation reflected in an express written agreement, as in *Ring v. Spina,* 148 F.2d 647, 650 (2d Cir.1945) and *Varo v. Comprehensive Designers, Inc.,* 504 F.2d 1103, 1104 (9th Cir.1974)—withholding arbitration until the antitrust claims are litigated may be appropriate. However, the antitrust claims alleged by Lake do not appear on their face to be clear, substantial, or easily proven.[7] Lake's allegations of conspiracy among a parent corporation and two of its wholly owned subsidiaries no longer charge a violation of the Sherman Act in light of *Copperweld Corp. v. Independence Tube Corp.,* — U.S. —, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). *Independence Tube* is not dispositive of Lake's antitrust claims under state law, but it is likely to be persuasive to the Supreme Court of California in interpreting state antitrust statutes.[8] Even if ICC's denial of price discrimination is disproved, to establish a violation of 15 U.S.C. § 13(a) Lake must show "a reasonable possibility that a price difference may harm competition," *Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 434, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1982)—a difficult task given the volatile and highly specialized nature of the market involved. An-

---

7. Lake does not argue that a factual determination of the strength of the antitrust issue is required. On the contrary, both in the trial court and in this court Lake relies entirely on the argument that a *prima facie* antitrust violation has been alleged on the face of the complaint. Lake made no effort to support its antitrust claims though discovery was not stayed.

8. As the Supreme Court of California noted in *Marin County Bd. of Realtors v. Palsson,* 16 Cal.3d 920, 549 P.2d 833, 835, 130 Cal.Rptr. 1

(1976): "A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act." (citations omitted). The California courts have previously followed federal case law in this area. *See, e.g., MacManus v. A.E. Realty Partners,* 146 Cal.App.3d 275, 287, 194 Cal.Rptr. 567 (1983).

titrust violations are alleged and may ultimately be proven, but these are not promising signs.

Aside from such uniquely antitrust issues as whether appellees participated in a conspiracy with the purpose and intent of eliminating Lake as a competitor and the impact of appellees' alleged conduct upon competition in the market, the underlying factual issues presented by this case are the kind commonly resolved by arbitration. They concern the nature and scope of the obligations undertaken by the contracting parties and whether these obligations have been breached: whether ICC agreed to deal exclusively with Lake in purchasing for resale particular electronics produced by particular Korean manufacturers; whether in consideration of this exclusive arrangement Lake furnished ICC with confidential business information; whether ICC misused this confidential information; whether ICC agreed to accept responsibility for quality control in the manufacture of the electronics, and for inspection before shipment; whether goods delivered by ICC under the contract were defective; whether ICC charged Lake higher prices than provided in the contract; the amount due, if any, under the contract; and so forth. These are the kinds of factual disputes that commonly arise in commercial dealings between businesses. Such issues are best resolved in arbitration proceedings, and are commonly referred to arbitration even when they arise in situations that also present antitrust issues. *See Plastik Pak*, 396 F.2d at 715–16; *see also N.V. Maatschappij Voor Industriele Waarden*, 532 F.2d at 876. Their resolution by arbitra-

tion may assist the court in resolving the antitrust claims. *Plastik Pak*, 396 F.2d at 716.

It appears from the record that in the main these issues can be readily separated from antitrust issues, *see generally Applied Digital Technology*, 576 F.2d at 118; *Cobb v. Lewis*, 488 F.2d at 49–50.[9] In arguing to the contrary, Lake selects as an example the issue of whether the electronics were defective. Lake asserts: "This issue, addressed either [as] a defense or affirmatively, however, would encroach on one of the central antitrust issues of this litigation: that the electronics were deliberately manufactured and shipped as defective pursuant to a conspiracy to sabotage Lake as a competitor." But arbitrators should have no difficulty in considering and deciding whether the electronics were defective without resolving whether the defects, if any, were deliberate and in furtherance of a conspiracy in restraint of trade. Lake's other illustrations are no more persuasive.[10]

This is not to say there is no possibility of conflict. Count XII of the complaint, for example, pleads a cause of action for common law deceit by realleging the facts relied upon in the antitrust counts, and substituting allegation of intent to deceive purchasers and consumers and to injure and defraud Lake. Inquiry into appellees' intent would involve the arbitrators in an issue crucial to Lake's antitrust claim, and therefore would be inappropriate. *See Applied Digital Technology*, 576 F.2d at 119. ICC has apparently not submitted this issue to arbitration. If it did, or if Lake

---

**9.** Although Lake contends the district court erred in determining that the antitrust issues are separable from the arbitrable issues, Lake does not fault the procedures employed below. Lake has not argued that a remand for factfinding on this issue is necessary.

**10.** Lake relies heavily on the decision of the Southern District of New York in *Hunt v. Mobil Oil Corp.*, 410 F.Supp. 10, 26 (S.D.N.Y.1975), *aff'd* 550 F.2d 68 (2d Cir.1977). *Hunt* is readily distinguishable. In *Hunt* plaintiff alleged that withholding oil due him under the supply provision of an agreement with seven major oil companies "was not only a breach of the Agreement,

but also a concerted refusal to deal with him and a group boycott in furtherance of the conspiracy to eliminate him as a competitor." 410 F.Supp. at 26. Thus, the breach of contract claim and the antitrust violation were coextensive. The court concluded it would be unrealistic under these circumstances to believe the arbitrator could decide the contract dispute without inquiring into the antitrust issues. In contrast, although the antitrust and breach of contract issues in this case overlap to some extent, in the main they appear reasonably severable.

were to seek discovery regarding the intent element of the antitrust claims, the conflict would come before the district court pursuant to the court's order, and could be resolved so to protect the court's exclusive jurisdiction over the antitrust claims.

 Moreover, if despite periodic monitoring of both arbitration and discovery by the district court the arbitrators were to decide issues critical to the antitrust claims, the court would not be compelled to accept the arbitrator's findings on those issues. *University Life Insurance*, 699 F.2d at 851. *But see Miley v. Oppenheimer & Co.*, 637 F.2d 318, 336 (5th Cir.1981) (dictum); *Dickinson v. Heinold Securities, Inc.*, 661 F.2d 638, 644 (7th Cir.1981). The application of collateral estoppel is discretionary. *True Drilling Co. v. Donovan*, 703 F.2d 1087, 1093 (9th Cir.1983). As noted in *Western Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 809 (9th Cir.1980),

> [c]ollateral estoppel is not to be applied mechanically. In proper circumstances it can prevent the waste of judicial resources and shield litigants from duplicative and often vexatious lawsuits. As the Supreme Court recently has recognized, however, countervailing policies may justify a refusal to apply principles of estoppel. *Standefer v. United States*, 447 U.S. 10, 25 [100 S.Ct. 1999, 2008, 64 L.Ed.2d 689] (1980); *Montana v. United States*, [440 U.S. 147, 162, 99 S.Ct. 970, 978, 59 L.Ed.2d 210 (1979)].

As the Court said in *Standefer*, " 'competing policy considerations' [may] outweigh the economy concerns that undergird the estoppel doctrine." 447 U.S. at 25, 100 S.Ct. at 2008.[11]

The Supreme Court's recent opinion in *McDonald v. City of West Branch*, —— U.S. ——, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), strongly supports this view. *West Branch* holds a federal court should not afford res judicata or collateral estoppel effect to an arbitration award in a subsequent § 1983 action. *Id.* at 1804. The Court noted that earlier cases reaching the same result in actions under other statutes (*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (Title VII) and *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (Fair Labor Standards Act)) "were based in large part on our conclusion that Congress intended the statutes at issue in those cases to be judicially enforceable and that arbitration could not provide an adequate substitute for judicial proceedings in adjudicating under those statutes." *Id.* 104 S.Ct. at 1802–03. As we have seen, the same premise applies to antitrust statutes. Three of the four considerations that led the Court to conclude that preclusive effect should not be given to arbitration awards in § 1983 suits are relevant in the antitrust context as well: the limited expertise of arbitrators; the limited scope of arbitrators' authority to decide issues; and the procedural differences between arbitral and judicial factfinding. *Id.* The complexity of antitrust issues and the significant public interest in antitrust enforcement are additional reasons for denying preclusive effect to an arbitration decision on antitrust issues.

In summary, we conclude that the court's order was not an abuse of discretion in view of: (1) the strong policy favoring enforcement of arbitration agreements in international commercial contracts such as this one; (2) the relative weakness of Lake's antitrust claims; (3) the apparent separability of the antitrust issues from those subject to arbitration; (4) the procedure established by the district court, with-

---

11. These principles also limit the enforcement of arbitration awards under the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards:

> Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that: (a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or (b) The recognition or enforcement of the award would be contrary to the public policy of that country.

June 10, 1958, 21 U.S.T. 2518, 2520, T.I.A.S. No. 6997.

out objection, to identify arbitrable and nonarbitrable issues, and to permit both discovery on the antitrust issues and arbitration of the antitrust issues to proceed under the court's supervision; and, finally, (5) the discretion vested in the court to deny collateral estoppel effect to any finding of the arbitrator that may be tainted by inadequate procedures or infringe upon the court's exclusive jurisdiction over antitrust claims.

The stay entered by this court is vacated, and the cause remanded for further proceedings consistent with this opinion.

VON DER HEYDT, Chief Judge, Sitting by Designation, concurring only in the result.

I concur only in the result, which at long last vacates the stay entered by this court and remands the case to the district court for further proceedings. In my view this could and should have been accomplished by brief order 2½ years ago. My colleagues on the panel did not and do not agree with the efficiency or simplicity of this procedure.

This case came to the court on June 22, 1981, as an expedited appeal. Obviously, it has failed to retain that status. I find Chief Judge Browning's opinion breeds more questions than it answers. The order of the district judge from which appeal was taken was a novel but workable procedure under the unique circumstances of the case. The fault was not in what the district judge attempted to do, but the manner in which he did it, i.e. a poorly drawn order which left the litigants without adequate direction.

My view in the beginning which remains today is that the district court's order should have been vacated shortly after oral argument (December 8, 1981), and the cause remanded with instructions to the district judge to redraw his order with the specificity adequate to guide the litigants.

Thus, I concur only in the result which finally sends the case where it long has belonged—to the district judge.