**UNIVERSAL STUDIOS INC., a Delaware corporation, and Universal City Studios Inc., Plaintiffs,**

v.

**VIACOM INC., a Delaware corporation, Viacom International, Inc. (successor by merger to Paramount Communications Inc.), a Delaware corporation, and Eighth Century Corporation, a Delaware corporation, Defendants.**

**VIACOM INC. and Eighth Century Corporation, Plaintiffs,**

v.

**The SEAGRAM COMPANY LTD., Universal Studios Inc. and Universal City Studios Inc. Defendants.**

**Civil Action Nos. 14971, 14973.**

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 7, 1997.
Decided: May 15, 1997.

Bruce M. Stargatt, David C. McBride, and Josy W. Ingersoll of Young, Conaway, Stargatt & Taylor, Wilmington (Herbert M. Wachtell, Michael W. Schwartz, Rachelle Silverberg and Gregory P. Taxin of Wachtell, Lipton, Rosen & Katz, New York City, Ronald Olson, Glenn D. Pomerantz and Allison Stein of Munger, Tolles & Olsen, Los Angeles, CA, of counsel), for Universal Studios Inc., The Seagram Company, Ltd. and Universal City Studios, Inc.

Rodman Ward and Anthony Clark of Skadden, Arps, Slate, Meagher & Flom, Wilmington (Robert E. Zimet, Samuel Kadet, Seth M. Schwartz of Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel), for Viacom Inc., Viacom International Inc. and Eighth Century Corp.

## OPINION

STEELE, Vice Chancellor.

### I. Issue Presented

Several entertainment industry leaders join forces in order to explore the as-yet unknown potential of a new business—cable television. They agree to channel their efforts and resources in this area solely through their common enterprise. Some fifteen years later, the industry and their venture (the USA Networks) are a great and growing success. One of the two remaining original partners is acquired by an entity with its own pre-existing cable networks, contravening the exclusivity agreement of the original parties. Each partner now sues the other and its affiliates for various claims

including specific performance of the non-compete covenant of the exclusivity agreement and for breach of the fiduciary duty of loyalty.

I conclude that when the parties' agreements have been breached but neither the innocent party nor the venture suffers immediate quantifiable harm, the equitable powers of this Court afford me broad discretion in fashioning appropriate relief. The parties should, under the unique circumstances of this case, be intimately involved in shaping the appropriate relief and will submit either a single agreed or separate plans for dissolution of their venture consistent with the legal conclusions and specific directions set forth in this opinion.

## II. Background

This case presents a basic contract dispute. What makes it something other than ordinary (introducing complication and thus a lengthy opinion) is the overlay of business policy considerations peculiar to the media industry, entangled factual disagreements and, of course, a large financial stake. Reduced to the barest and uncontested minimum, the basic facts are these: In 1981, two owners of a formerly unincorporated New Jersey joint venture known as the USA Network,[1] pledged their respective fifty percent ownership interests to a newly formed New York partnership. The two partners to this venture were Time Incorporated and Gulf & Western Industries, Inc. ("G & W"). On August 27, 1981, the two partners signed a Joint Venture Agreement (the "Two–Way Agreement").[2] By the terms of this agreement, the "scope and purpose" of the venture is to "engage generally in the business of providing to cable television systems a national, video, advertiser-supported basic cable network[.]"[3]

The Two–Way Agreement also included a non-compete provision prohibiting the participants from engaging in this same business and requiring them to "promote the activities of the Venture so as to ensure its success[.]"[4] The parties included a complicated series of steps necessary for a partner to exit the venture.[5] A significant aspect of this particular provision is a "buy-sell" mechanism in which the participant[6] wishing to leave the venture initiates a process in which it ultimately loses control of whether it is to be the buyer or seller as well as the transaction price. Finally, G & W and Time executed separate guarantees of their subordinate participants' obligations under the Two–Way Agreement.[7]

Very shortly thereafter, MCA Incorporated[8] joined this venture by purchasing a one-third interest from the existing partners. Each of the parties' interests in the USA Networks were by now held by wholly-owned subsidiaries: Time's, by its Time Video Holdings, Inc.; G & W's by its Eighth Century Corporation; and MCA's by its MCA Cable Services Inc. This, of course, necessitated a new joint venture agreement and also resulted in new guarantees.

Before the parties signed the new agreement, proposed changes in the language of

---

1. *See* M–1 (Joint Venture Agreement between Madison Square Garden Productions, Inc.("MSGP") and UA–Columbia Satellite Services, Inc. of October 1, 1979). Trial exhibits with the prefix "M" and "V" are those of MCA and Viacom respectively. In most instances the exhibit number of both parties is given.

2. M–12, V–2 ("JVA1"). G & W's wholly-owned subsidiary, Paramount Pictures Corporation, was the G & W participant to the agreement.

3. JVA1 at § 2.02.

4. JVA1 at §§ 7.01, 2.02.

5. JVA1 at Art. VIII.

6. " 'Participant' or 'Participants' shall mean a partner or the partners of the Venture[.]" JVA1 at Art. I.

7. M–24 (G & W Two–Way Guarantee), M–27 (Time Two–Way Guarantee). However, G & W did not guarantee its performance of the non-compete provision in Article VII—only the performance of its subsidiaries Paramount Communications and Eighth Century Corporation.

8. In December 1996, MCA Incorporated changed its name to Universal Studios Incorporated by amendment to its Certificate of Incorporation. By order dated 10th April 1997, the captions in these actions were amended to reflect the change. This opinion does not make the substitution, however, in order to facilitate the reader's reference to the trial transcript and exhibits.

the non-compete provision (section 7.01) created complications. Paramount initially raised concerns.[9] Because of the addition of the phrase "directly or indirectly" to the non-competition provision in the new agreement, Paramount expressed concern it might be prohibited from continuing to operate its subsidiary, Madison Square Garden Network ("MSGN"), an advertiser-supported regional cable sports network.[10] The parties reached an accommodation (about which more will follow) and the subsidiaries signed an Amended and Restated Joint Venture Agreement on October 15, 1981 (the "Agreement" or "Three–Way Agreement").[11] The parent companies also signed newly-drafted guarantees of the same date.[12]

The venture went well until Time became disenchanted. It would seem that Time chafed under the contractual restraints of the Agreement.[13] In 1987, Paramount and MCA agreed to purchase Time's interest, thereby releasing Time from the Venture and the Agreement.[14] While this again reduced the number of participants to two, the Three–Way Agreement and Guarantees (excepting Time's) have not since been amended to reflect the change and so remain the instruments governing the instant dispute.

A number of provisions in the Agreement define the management and direction of the Venture.[15] Generally speaking,[16] the Agreement provides for the Venture to be governed by a committee of directors appointed in equal numbers by the participants.[17] The committee must act unanimously in the approval or disapproval of "all material actions to be taken by the Venture and any other matters determined from time to time by the Participants to be reserved for decision by such Committee."[18] The Committee appoints and defines the authority of the Venture's chief executive and senior management, sets the operating and capital expenditure budgets for the upcoming years, and approves all long-term financial commitments and forecasts.[19] The participants also have effective control over the accounts of the Venture and receive full financials on a regular basis.[20]

The development of this venture proceeded apace with the rapid development of the cable industry generally. With the exception of the Time exit, the same was true within the Venture. Long-existing business and personal relationships were held between Paramount and MCA and the heads of these companies.[21] More recent changes in control or ownership of the venturers, however, have brought new businesses and personal relationships. These changes, punctuated by this litigation, began with several legal and financial battles for control of Paramount. In those battles, Sumner Redstone's Viacom Inc. fought for and won the right to acquire Paramount. In March of 1994, Viacom successfully completed its tender offer for a majority of Paramount shares. In July of 1994, having acquired a majority stake, Via-

---

9. G & W ultimately changed its name to Paramount Communications, Inc. I will therefore refer hereafter to Paramount instead of G & W and as inclusive of the relevant subsidiaries unless greater specificity is required.

10. *See* Trial transcript ("Tr.") 646–47, 154–55.

11. M–38, V–3 ("JVA2").

12. M–41, V–4(G & W); M–42, V–136(MCA); M–43 (Time). The exclusion relieving G & W from the prohibitions of the non-compete was removed from its new guarantee.

13. *See, e.g.,* M–58 (letter from MCA to Time *re* the activities of a Time subsidiary); M–64 (letter from Paramount to Time *re* same); M–60,–63 (correspondence *re* Time subsidiary and USA Network's advertising sales department); M–76 (request by Time for waiver *re* non-compete); Tr.

398–99 (testimony of MCA president Sidney Sheinberg *re* Time's exit from the venture).

14. M–98.

15. *See* JVA2 Ats. III–V.

16. Because extensive quotation will be necessary below, the reader will be spared other than minimal quotation of the provisions in this section.

17. JVA2 §§ 3.01–02.

18. JVA2 §§ 3.03, 3.01.

19. JVA2 §§ 4.01–5.01.

20. JVA2 Art. V.

21. *See* Tr. 415.

com completed a second-step merger of Paramount and a Viacom subsidiary.[22]

Viacom brought with it a number of existing cable channels. These included Music Television ("MTV"), Video Hits One ("VH-1"), Nickelodeon and Nick-at-Nite ("NAN").[23] Viacom also owned a fifty percent interest in another cable network, Comedy Central. The joining of the two companies, Viacom and Paramount, thus brought with it potential problems with the Agreement and Guarantee.[24] Since the merger, Viacom has created a "spin-off" of NAN known as Nick-at-Nite's TV Land ("TV Land").[25] By contrast, MCA's interest in a "national, video, advertiser-supported basic cable network" remains exclusive to the USA Networks.[26]

As should already be apparent, Viacom's ownership and operation of these networks has led to the present dispute.[27] A brief review of the parties' efforts to resolve their dispute will complete the history of the case and is necessary for its resolution. There are significant differences concerning some of the events. These differences will be resolved, where necessary, in the discussion section below.

The first expression of concern regarding the Viacom cable networks came shortly after announcement of the Paramount–Viacom merger. Wasserman and Sheinberg[28] of MCA met with Davis and Jaffe[29] of Paramount.[30] Whether the concerns expressed by MCA at the meeting were passed on to Viacom, though it seems likely they were,[31] is not of particular import. Direct discussions between MCA and Viacom took place in March 1994, shortly after successful completion of the Viacom tender offer. A meeting was held at MCA in Los Angeles and was the first meeting of the companies and their top management. By any account of the meeting, both sides expressed their positions regarding Viacom's ownership of the MTV Networks and the joint venture Agreement.[32] Viacom's position had several facets: Its networks had been in existence for a long time before the merger and should therefore be exempted from the Agreement; competition from the Viacom networks would be insignificant; and their experience and market position would be helpful to the USA Networks.[33] MCA's position was relatively straightforward: The terms of the Agreement were violated by Viacom's ownership of the MTV Networks; and a competing entity now exercised equal control over the USA Networks venture.[34] The meeting ended amicably,

22. *See* M–100 (proxy materials for July 1994 Paramount special shareholders' meeting).

23. Within Viacom these networks are collectively organized as the "MTV Networks" and I will also refer to them as such. *See* Pre–Trial Brief of Viacom Inc., Viacom International Inc. and Eighth Century Corporation ("Viacom Pre–Tr. Br.") at 9.

24. There has not yet been, nor do I think there could be, any argument that the MTV Networks do not come within the definition of proscribed businesses in section 7.01 of the Agreement.

25. Because Nickelodeon is a children's channel, a different programming schedule, NAN, targeted at older viewers, begins in the evening. The success of Nickelodeon and NAN led Viacom to launch a separate channel, TV Land, with the same type of programming as NAN. *See* Viacom Pre–Tr. Br. at 10. As such, Viacom claims TV Land to be a spin-off of NAN rather than an additional network.

26. Before Viacom's acquisition of Paramount, the USA Network launched an additional net-

work called the Sci–Fi Channel. The Venture has since been known as the USA Networks.

27. Viacom also owns and operates additional cable and other networks that, for one reason or another, do not come within the reach of section 7.01 and are thus not here at issue.

28. Lew Wasserman was at that time the chairman and chief executive of MCA. Sidney Sheinberg was at that time MCA's president.

29. Martin Davis was then the chairman and chief executive of Paramount. Stanley Jaffe was then the president and chief operating officer of Paramount.

30. Tr. 441–445; M–106 (memo to file of Stanley Jaffe *re* meeting).

31. *See* Tr. 2716–18.

32. Tr. 783–85, 3052–59.

33. Tr. 1700–05.

34. Tr. 447–52.

with both sides agreeing to make efforts to resolve their differences. Shortly thereafter MCA and Viacom signed a tolling agreement with respect to any claims MCA might assert against Viacom concerning the USA Networks.[35]

During the Spring of 1994 Viacom made proposals regarding the management of the USA Networks. These were the transfer of the USA Networks' advertising sales department to that of the MTV Networks, and the placement of the chairman and chief executive of the MTV Networks, Tom Freston, on the executive committee of the Venture.[36] From Viacom's perspective this would be consistent with the positions expressed during the March meeting—its associated interests could benefit the Venture. From MCA's perspective the suggestions could not have been better calculated to underscore its view that its new partner's conflicting business interests made joint ownership of the USA Networks untenable. The suggestions drew expressions of concern from management at the USA Networks as well.[37] Neither proposal was warmly received nor came to pass.

In April and June of 1995, The Seagram Company, Limited, a subsidiary of the Canada-based beverage company Joseph E. Seagram & Sons (collectively "Seagram"), acquired eighty percent of MCA. Matsushita Electric Company of Japan continues to hold the remaking twenty percent. During the months immediately following this purchase, MCA senior management, including Wasserman and Sheinberg announced their departures.[38]

In October 1995, Viacom publicly announced the launch of TV Land.[39] Whether one characterizes TV Land as merely a brand extension/spin-off, as Viacom does,[40] or a new cable network as MCA does, makes little difference.[41] The important factor is the launch reheated the parties' dispute. One might fairly infer that since little effort or headway had been made toward resolving the dispute up to that point, Viacom thought it would simply fade away. MCA, on the other hand, felt TV Land's launch added insult to injury and may actually have been timed intentionally to pre-empt a similar proposed effort by USA—an "action/adventure" channel.[42] While TV Land was not yet advertiser-supported,[43] neither MCA nor USA were given any individualized, specific warning of the public announcement. The TV Land launch did not positively impact upon Viacom–MCA relations. The parties held at least one meeting later in an effort to resolve the simmering dispute,[44] and by December signed a Supplemental Tolling Agreement, reserving MCA claims relating to TV Land.[45] Following the signing of the second tolling agreement, a meeting between Viacom and MCA executives took place on January 4, 1996, in a further effort to resolve their differences and address the newly-added issue of TV Land. This effort proved no more successful than any of the previous efforts—the parties' positions remained unchanged.[46]

Redstone's abrupt dismissal of Frank Biondi as Viacom's chief executive officer precipitated the next significant series of

---

**35.** M–369 (Agreement, signed April 8, 1994).

**36.** Tr. 2641.

**37.** Tr. 1554–60 (reading of selected portions of deposition of Kay Koplovitz, president and chief executive of USA Networks).

**38.** Tr. 1095–1101.

**39.** M–185 (press release of October 27, 1995).

**40.** *See supra* n. 25.

**41.** It seems to me that both parties are correct: conceptually, TV Land is not a new idea—it is basically full-time NAN programming. As a practical matter, however, it is a new spot on the

dial (if I may use that now-anachronistic expression) and thus a new competitor for prime space on cable systems, for advertising and for 'eyeballs' (as several witnesses so artfully put it).

**42.** Tr. 795–98, 1123, 801–05.

**43.** Tr. 3826–27. It is not clear from the record whether it has since become advertiser-supported.

**44.** Tr. 2789–90.

**45.** M–370 (Supplemental Agreement, signed December 21, 1995).

**46.** Tr. 3087–93, 116–20.

events.[47] Coincidentally, Edgar Bronfman, Jr., president and chief executive of Seagram, was looking for someone to fill a similar role at MCA. Biondi, however, was bound by a non-compete clause in his employment contract. With Viacom's permission, Bronfman and Biondi negotiated the terms of an agreement for Biondi to run MCA. Bronfman then called Redstone to schedule a meeting to discuss an arrangement that would make consummation of the agreement possible. The telephone call led to two meetings between Bronfman and Redstone.

The first of the meetings took place on February 9, 1996. About the events of that meeting, Bronfman and Redstone generally agree. Redstone told Bronfman the conditions under which he would release Biondi from the non-compete provision of the Viacom employment contract: A waiting period of ninety days before any MCA public announcement,[48] and an MCA waiver of any claims relating to TV Land. Bronfman wanted Biondi to be released more quickly. Both Bronfman and Redstone generally agree they resolved to give some thought to their positions and meet again.[49]

The two met again the following Monday morning, and again in Redstone's office. Philippe Dauman, deputy chairman, executive vice-president and general counsel of Viacom attended.[50] Bronfman remembers the events of the meeting on 12th February as follows: He agreed to Redstone's request to waive MCA claims regarding Viacom's TV Land, but asked that Biondi be released in thirty days from the date of the meeting.[51] Bronfman also remembers discussion concerning confidentiality problems, timing questions regarding when drafting of MCA's waiver was to begin, and potential SEC disclosure obligations. According to Bronfman, as the meeting concluded and all rose, Dauman said to him: "So we have an agreement. You don't litigate on MTV, and we release Frank in 30 days." [52] Bronfman claims that because this was not the agreement discussed during either this or the 9th February meeting, he assumed Dauman had misspoken; "thinking in my mind that he had ... confused one cable network with another." It is for this reason, Bronfman explains, that he answered "Yeah" to Dauman's question, rather than correcting him.[53]

Redstone's view, though generally remembering the meeting of the 12th as covering the same subject areas, is that Dauman discussed, and at some length, an MCA waiver with respect to all claims related to all of the MTV Networks. Redstone also remembers Bronfman clearly giving his assent to this broader waiver, shortly before the meeting was over.[54] Dauman's recollection supports Redstone's in that he recalls more than passing reference to an MTV Networks waiver, that the terms of the more inclusive waiver were discussed and that Bronfman clearly agreed to this waiver.[55]

When a draft was circulated several weeks later, it was based on the Viacom view of the waiver.[56] Neither this draft waiver, nor subsequent drafts, could be reconciled with Bronfman's understanding of their agreement. Not surprisingly, the parties never signed an agreed waiver. On April 22, Redstone unconditionally released Biondi from

---

47. Tr. 1745.

48. Redstone had been roundly criticized in the press for his dismissal of Biondi. *See* M–408 (newspaper article).

49. Tr. 114347 (Bronfman), 1747–51 (Redstone).

50. Dauman is also Viacom's chief administrative officer and corporate secretary. Bronfman testified that he was surprised to find Dauman at the meeting. Tr. 1155–56. Redstone, however, remembers discussing this over the phone following the meeting the previous Friday. Tr. 1751, 1765.

51. Tr. 1155–67.

52. Tr. 1163.

53. Tr. 1164. Bronfman claims he did not know that Viacom's Networks were designated internally under the collective "MTV Networks."

54. Tr. 1766–67.

55. Tr. 3099–3106.

56. V–39 (Draft of Agreement, dated March 5, 1996). This draft also included a waiver of possible future claims related to extensions and expansions of existing MTV Networks—something not discussed during the meetings.

the non-compete clause in his Viacom employment agreement.[57]

Later discussions between the parties have not yielded a resolution. At the end of April 1996, MCA filed a complaint, since amended, bringing claims against Viacom entities for breach of contract, tortious interference with contractual relations, and breach of fiduciary duty, and seeking various forms of equitable relief. Viacom responded in kind and on the same day, bringing like claims and seeking similar relief. Pursuant to a joint pre-trial order on 7th October 1996, the cases were consolidated for trial. Trial was held between 15th October and 6th December, and included a recess for the parties to hold further, though ultimately unsuccessful, settlement negotiations. This opinion's findings of fact and conclusions based upon those facts address all parties' claims in both actions.

### III. Discussion

#### A. Breach of Contract

MCA brings claims of breach of contract against both Viacom International and Paramount. As should by now be readily apparent, resolution of the contractual issues depends upon the non-compete clause (section 7.01) of the Agreement and the parent company Guarantees. I therefore start with the relevant language of those provisions.

Section 7.01 of the Agreement provides:
*Promotion of the Venture,* Each Participant shall endeavor to promote the activities of the Venture so as to ensure its success within its basic purpose and the basic scope of its operation as set forth in Section 2.02, and a Participant shall not directly or indirectly except through the Venture engage in the business of (x) providing to cable television systems a national, video, advertiser-supported, basic cable entertainment network ... Nothing herein

shall be deemed to limit the right of the Participants or their Affiliates fully and freely to engage in any business outside such basic purpose and scope of the Venture[.]

In relevant part, the Paramount Guarantee provides:
2. The Guarantor hereby guarantees to each of the Other Participants and to any successor Participant ... under the Joint Venture Agreement the full and faithful performance of all the obligations and duties under the Joint Venture Agreement of the Subsidiary and of any successor participant to the Subsidiary under the Joint Venture Agreement that is an Affiliate (as such term is defined in the Joint Venture Agreement) of the Guarantor, and the Guarantor further guarantees that such duties and obligations shall be performed and discharged with the same effect as though the Guarantor were a Participant under the Joint Venture Agreement.

3. The Guarantor agrees with each Other Participant for its benefit and for the benefit of any successor participant to such Other Participant under the Joint Venture Agreement that the provisions of Article VII of the Joint Venture Agreement shall apply to the Guarantor and its Affiliates and that it shall comply and cause such Affiliates to comply with such provisions, so long as any Affiliate of the Guarantor is a Participant under the Joint Venture Agreement, with the same effect as though the Guarantor were itself at all such times a Participant under the Joint Venture Agreement.

Viacom raises a number of arguments against the seemingly obvious conclusion that the language of the Agreement and Guarantee is inconsistent with their ownership and operation of the MTV Networks.[58] Broadly

---

**57.** V–18. The letter explained: "Until very recently, I was convinced that no real issue actually existed between us and MCA or, if one was asserted to exist, that such issue was easily resolvable or had, in fact, been, by agreement, resolved. I have recently concluded that such might not be the case. I do not wish you to become a pawn in any possible dispute, nor do I wish to unduly delay your taking advantage of

any employment opportunity which might seem desirable to you. I am sure that you know that we wish you great success in whatever you choose to do."

**58.** As noted above, no argument has been raised to challenge the classification of the MTV Networks as within the section 7.01 description.

categorized, Viacom has raised two main arguments: 1) the Guarantee is not binding on the successors or assigns of the original signatory; and 2) even if it is, the Agreement does not bar the continued operation of existing networks though they may otherwise come within the scope of section 7.01's prohibitions.

■ As an initial matter, I note that both the Agreement and Guarantee are governed by New York law.[59] Before turning to the specifics of these arguments, a brief statement of well-settled rules of contract construction is necessary. The starting point is, of course, that the language of a contract is to be given its plain and ordinary meaning.[60] Accordingly, where the provisions of a contract are plain and unambiguous, "evidence outside the four corners of the document as to what was actually intended is generally inadmissible." [61]

■ Though much of the trial was devoted to testimony from persons who participated in the drafting process and the intent of the principle parties at the time these contracts were signed, the first position of both MCA and Viacom is that the Agreement and Guarantee plainly and unambiguously support their respective positions. The assertion of these mutually exclusive readings, however, does not render otherwise clear terms ambiguous, and so does not require variation from the starting rule just given.[62] The necessity of preserving predictability and stability in commercial transactions is fostered by this objective view of contracts, and takes on additional weight when the parties to the contract are as sophisticated as those in this dispute. With these precepts in mind, I return to the agreements.

■ **1. The Guarantee:** Turning first to the Guarantee, I find there the plain and unequivocal expression of the contract's binding effect on the signatories' successors. In paragraph three, the guarantor expressly agrees to be bound by the provisions of Article VII of the Agreement. Equally clear in paragraphs two and three is that the guarantor agrees that its "Affiliates" will be bound to the same extent. Finally, paragraph two also directs the reader to the definition of "Affiliate" contained in the Agreement. That definition is as follows:

"Affiliate" shall mean any corporation or business association which, directly or indirectly, is controlled by, is in control of or is under common control with the the [sic] corporation or business association with reference to which the term "Affiliate" is used. Ownership of 50% of the voting or decisional power with respect to any such corporation or business association shall be deemed control.

As set forth above, in 1994 Viacom Inc. became the sole shareholder of Paramount. The corporate entity Paramount survived that merger but in 1995 was merged into a Viacom Inc. subsidiary, Viacom International, the direct owner of the MTV Networks.[63] Thus, immediately following Viacom Inc.'s acquisition of Paramount, Viacom International and Paramount were under the common control of Viacom Inc., and as such were affiliates within the definition of the Guarantee. The merger of Paramount into Viacom International does not change this result, although it requires a different route. That is, paragraphs two and three of the Guarantee state that the guarantor's "duties and obligations shall be performed and discharged with the same effect as though the Guarantor were a Participant under the Joint Venture Agreement." [64] Article XIV of the Agreement contains its "successors and assigns" provision, and so must be considered to similarly bind, by its incorporation, the successors and assigns to the Guarantee. Accordingly, even after Paramount was

59. JVA2 Art. XII; Guarantee ¶ 5.

60. *See Brooke Group Ltd. v. JCH Syndicate 488,* 87 N.Y.2d 530, 640 N.Y.S.2d 479, 482, 663 N.E.2d 635, 638 (1996).

61. *Weissman v. Sinorm Deli, Inc.,* 88 N.Y.2d 437, 646 N.Y.S.2d 308, 313, 669 N.E.2d 242, 247 (1996) (citation omitted).

62. *See Moore v. Kopel,* 653 N.Y.S.2d 927, 929 (N.Y.App.Div.1997).

63. *See* Tr. 3025–28.

64. Guarantee ¶¶ 2, 3 (quoting ¶ 2).

merged into Viacom International the Guarantee continued in force to bind the successor. Even if this were not the case, as both Paramount and Viacom International are Delaware corporations, section 259 of the Delaware General Corporation Law would require the same result.[65]

In opposition, Viacom argues against the incorporation of the successors and assigns provision from the Agreement.[66] Viacom contends that the inclusion of successors and assigns clauses in other agreements of the parties must mean the parties intentionally omitted one from the Guarantee.[67] I find I cannot agree with this contention. First, because the plain language of the Guarantee incorporates within and binds the parties to the provisions of the Agreement, and second because it is more logical to conclude that, having incorporated one such provision, there was no need to include another. Viacom's further argument, that where the parties intended to incorporate provisions from the Agreement in the Guarantee they did so explicitly, is no more persuasive. The examples cited—the express incorporation of definitions and the non-compete—are again explained by more logical answers than the one suggested by Viacom. Specifically, in a dependent contract like the Guarantee, it will only make sense to incorporate by reference those same definitions contained in the primary agreement. Further, the inclusion of explicit reference to Article VII is more logically explained by both its central importance to the Agreement and also by the change from the express exclusion of that provision from the earlier Two–Way Guarantee. Finally, I note that Viacom's negative inference argument is insufficient to overcome the statutory mandate of section 259.[68] The New York cases cited by Viacom are not to the contrary.[69]

**2. The Agreement:** Viacom's second argument is not sufficiently compelling to generate a great deal of discussion. In essence it is this: Because the original parties to the Venture excluded their preexisting businesses, Viacom's preexisting businesses likewise should be excluded. It is logical enough thus stated. The flaw, however, is readily apparent when one considers that none of the preexisting businesses of the *original* parties came within the scope of the Venture. This, of course, makes perfect sense when one remembers the nascent nature of the cable industry in 1981. It is certainly true, as Viacom claims, that the parties "intended" their preexisting businesses be excluded from the Venture. But this is because (with single exception) they had no such businesses even arguably competitive with their intended venture.[70]

65. 8 *Del. C.* § 259 (1993) ("Status, rights, liabilities, of constituent and surviving or resulting corporations following merger or consolidation.").

66. Post-Trial Brief of Viacom ("Viacom Post–Tr. Br.") at 45–50.

67. *Id.* (citing as examples a preliminary Purchase Agreement (M–39 at ¶ 18), the Agreement (M–38, V–3), and documents related to Time's exit and release from the Venture (M–99, V–570–571 at ¶¶ 10)).

68. *See Western Air Lines, Inc. v. Allegheny Airlines, Inc.*, Del. Ch., 313 A.2d 145, 153–54 (1973) ("If the agreement does not specifically state it is not applicable to successors and assigns, the policy of the law is so clear that survival should be taken as the normal course of events.").

69. *Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773 (2d Cir.1995) was decided in the very different context of an arbitration agreement. The Second Circuit found that "ordinary principles" of contract construction did not support holding the non-signatory to the terms of the arbitration agreement, and further, that the arbitration clause sought to be enforced was contained in an agreement unrelated to the contract under which the claims arose. *Scottish Air Int'l v. British Caledonian Group, PLC*, 81 F.3d 1224 (2d Cir.1996), also cited by Viacom, has even less relevance to the present dispute. In that case, an earlier court-approved settlement agreement gave the plaintiff board representation as long as he continued to be a stockholder of the company. Following a reorganization of that company, the plaintiff traded his shares for shares in a related company. The Second Circuit refused to hold the defendant in contempt of the settlement order since plaintiff was no longer a shareholder in either the original or the successor entity.

70. The single exception, MSG Network, was a video, advertiser-supported, basic cable, regional sports network. As such, it arguably came close to fitting "indirectly" within the prohibiting language. Its express exclusion from Article VII, however, indicates nothing more than the parties' understanding that Article VII does indeed

Here again, Viacom argues by negative inference. Here again, and even more so than above, I find the inference they would have me draw to be illogical. Does it make sense that the parties agreed to the language of Article VII, prohibiting partner competition with the Venture, yet also (as evidenced by the exclusion of their non-competing businesses) intended one to infer by negative implication from the Agreement that a successor partner would not be bound by the same provision?

Viacom argues, at least as to its unique situation as a successor, this is not so illogical because its businesses were in competition with the Venture long before its acquisition of Paramount. This argument has a certain immediate appeal. If the purpose of Article VII is to protect the Venture from competition, from an industry perspective the competition between the MTV Networks and the USA Networks is no greater or lesser because of the merger. Article VII, however, can only be read to protect the Venture from competition from its owners not from competition generally. The preexisting businesses argument does not answer the more logical purpose behind the non-compete, which is to promote the USA investment venture by shielding it from the hazards associated with divided loyalties.

In sum, implication of such a blanket exclusion could not, given the Agreement as a whole, have been intended by the parties; would not, given the objectives of the Venture, have made sense; and should not, given the effect such an implied term would have on the express prohibitions of Article VII, be considered fair to the remaining original partner.[71] Suggested implied terms, as a matter of common sense and reasonableness, must fit rationally within the entire scheme of the agreement into which the party seeks to have the court read them. I cannot conclude the implication of a term that would garrote an otherwise clear non-competition clause, as Viacom would have me do, to be rational or reasonable.

Finally, I take note of Viacom's suggestion that public policy would favor the less restrictive result of allowing it to continue to operate its business in violation of the Agreement and Guarantee as fostering competition.[72] While this is undoubtedly true and sound as a general matter, when weighed against the clear dictates of law and the competing (in this case) policy favoring predictability in contract construction, the argument is unpersuasive. I fail to see the benefit to competition generally, or joint ventures more specifically, ·if the enforceability of clearly expressed non-competition clauses so typical of this business form cannot reasonably be relied upon. Accordingly, I conclude that Viacom International, as successor to Paramount, is in breach of the Agreement by its continued ownership and operation of the MTV Networks.

An additional claim for breach of the Guarantee and Agreement is made against Paramount. MCA argues breach by Paramount under two separate theories. The first of these is that Paramount was required to see to it, in negotiating its merger with Viacom, that its soon-to-be affiliate would comply with Paramount's extant obligations, viz, Article VII and the Guarantee. Second, MCA argues that once the merger was complete and Viacom controlled Paramount, Paramount was additionally in breach by its failure to cause the compliance of its new affiliates.

MCA argues that during the merger negotiations, Paramount's obligation under the Guarantee to cause the compliance of its affiliates required it to either negotiate protective provisions into the merger agreements (presumably a provision requiring Vi-

---

reach preexisting businesses if they come within its purview. If there was an unwritten general exclusion, why the need to expressly exclude MSG?

**71.** *See* Viacom Post–Tr. Br. at 4648 (describing intent of the parties, logic of the proposed term, and fairness to the parties as requirements for implication of contractual term under New York law).

**72.** *See id.* at 62 (citing *In re Aimcee Wholesale Corp. v. Tomar Products, Inc.,* 21 N.Y.2d 621, 289 N.Y.S.2d 968, 969, 237 N.E.2d 223, 224 (1968); *Dionisi v. DeCampli,* Del. Ch., C.A. No. 9425, Steele, V.C., 1995 WL 398536 (June 28, 1995), Mem. Op. at 18).

acom to divest itself of either the MTV Networks or its future interest in the USA Networks), or to trigger the buy-sell mechanism of Article VII (a Paramount divestiture of its interest in the USA Networks). MCA argues Paramount's failure to do either of these constitutes its voluntary disablement from its contractual obligations.

Viacom counters that Paramount cannot be charged with a failure to cause Viacom's compliance before the merger. By the terms of the Guarantee, Paramount must cause its affiliates' compliance. As described above, the definition of affiliate contained in the Agreement, and incorporated in the Guarantee, makes clear that "affiliate" turns on control. Neither Viacom nor any of its subsidiaries could be considered affiliates within this definition unless they were "controlled by, [were] in control of, or [were] under common control with" Paramount.[73] As such, Paramount was not contractually obligated to cause Viacom's compliance with the non-compete.

■ Neither can I agree, as MCA argues, that Paramount was obligated to trigger the buy-sell provision. The language of section 8.02 is elective, not compulsory.[74] Nothing in the language of that provision, or elsewhere in the Agreement or Guarantee, requires a parent or participant in the Venture to divest its interest, regardless of circumstance.

■ Nor, finally, can I agree that Paramount voluntarily disabled itself from compliance.[75] I do not accept Viacom's argument that it was, in effect, the helpless and unwilling property in a bidding war between Viacom and QVC. Paramount was easily the largest of the three companies in that conflict, and in any event was ultimately merged with its original and intended choice. But Paramount did nothing to disable itself from

compliance. As I have concluded above, the prohibitions of the Agreement and Guarantee remain in force and have necessarily been assumed by Viacom International. On consummation of the merger, Viacom did become an affiliate of Paramount and assumed Paramount's obligations to comply with its covenants relevant here. Paramount came under the control of Viacom Inc., in common control with Viacom International, then later merged into Viacom International triggering Viacom International's obligation to ensure compliance. As Viacom readily, if not obviously, represented in its sworn SEC 8-K filing, "Viacom International is the surviving company and has assumed all obligations of Paramount as of such merger."[76] [T]he normal course of events' applies here—Paramount may be extinguished and therefore in no position to accomplish the impossible mission of compelling Viacom International to comply with its former contractual obligations, but the obligation to comply exists nonetheless, and the obligations pass to Viacom International.[77] In light of the SEC filing and Redstone's own candid observation at trial, this conclusion can come as no surprise to the defendants.[78] I conclude, Paramount, itself, nonetheless, fairly complied by finding a ready, willing and able successor to which it could pass on its responsibility as a matter of law.

### B. Tortious Interference

I must now consider MCA's claim against Viacom Inc. for tortious interference with contractual relations. Neither party devotes more than a footnote in their post-trial briefing to support or defend this claim.[79] It is, frankly, easy to understand why. MCA claims that "Viacom—which knew of Paramount's contractual obligations in this regard; knowing that Paramount was breach-

---

**73.** JVA2 Art. I.

**74.** JVA2 Art. VIII, § 8.02 ("Any Participant ... may ... offer to sell its ownership interest....").

**75.** *See* MCA Op. Post–Tr. Br. at 35, 36 (citing *Citibank (S.Dak.), N.A. v. F.D.I.C.,* 857 F.Supp. 976, 982 (D.D.C.1994) and *Conn Aire, Inc. v. J.C. Leasing,* 921 F.2d 276 (6th Cir.1990)).

**76.** M–137 at 2.

**77.** *Western Air Lines, Inc. v. Allegheny Airlines, Inc.,* Del. Ch. 313 A.2d 145, 152–154 (1973).

**78.** Redstone Tr. 1879; Dep. 132–133.

**79.** MCA Op. Post–Tr. Br. at 30 N.*; Viacom Post–Tr. Reply Br. at 32 N. 26. The parties apparently do not dispute the applicability of New York law to this claim.

ing those contractual obligations by failing to seek any such provision in the merger agreement; and knowing that it (Viacom) had no intention of complying (Redstone Tr.1916–17)—was guilty of tortious interference with MCA's contractual rights by entering into that merger agreement with Paramount." [80] In response, Viacom argues MCA has failed to prove any breach and, even if so, has failed to prove tortious intent. [81] Having previously rejected the first of the Viacom arguments, I consider the second, concluding there is sufficient merit to this theory to defeat MCA's tortious interference claim.

▬▬▬▬ MCA must prove Viacom, Inc. "intentionally and improperly interfere[d] with the performance of a contract[.]" [82] There can be no tortious interference by Viacom because the act complained of by this claim is the merger. But the merger, in and of itself, is not violative of Paramount's obligations under the Guarantee or the Agreement. In fact, the terms of the document presciently contemplated a possibility of new alliances in the future. [83] Instead, the focus of this case is the Viacom obligation necessarily assumed as the result of the merger.

Viacom concentrated before and during the merger, understandably, on that transaction rather than Paramount's USA Networks' participation. Viacom Inc. certainly knew of the non-compete provisions and may have improvidently rationalized away its obligations after the merger. But MCA has not carried its burden of proof on the required element of an intent to interfere in the performance of the parties' obligations under this joint venture agreement. A more appropriate analysis of Viacom Inc.'s actions must be within a discussion of the parties' fiduciary duties.

## C. Breach of Fiduciary Duty

MCA also brings claims against Viacom International and Viacom Inc. for breach of fiduciary duty. [84] The thrust of the MCA claims is that by virtue of Viacom's control over its participant in the Venture, it must assume the fiduciary obligations of its participant. These duties, MCA argues, are inconsistent with Viacom's simultaneous ownership of the MTV Networks. MCA claims the MTV Networks and USA Networks compete (on a variety of levels), dividing Viacom's loyalties. Viacom's first response is a challenge to its assumption of any fiduciary duties to MCA *vis à vis* the Venture. [85] The bulk of its response, however, is its further argument that the MTV Networks compete with the USA Networks only in the most general sense, and as such, create no division of its loyalties. [86]

▬▬▬▬ As an initial matter, I note the relationships necessarily giving rise to fiduciary obligations: The participants in the USA Networks, as co-venturers and partners owe fiduciary duties to each other; [87] their parents, as signers (or successors thereto) of the Guarantee "with the same effect as though the Guarantor were itself at all such times a Participant under the Joint Venture Agreement[,]" [88] voluntarily assumed the same mutual obligations. That is, as is indicated by both MCA and Viacom, Viacom's

---

**80.** *Id.* (citing *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980); *Gold Medal Farms, Inc. v. Rutland County Coop. Creamery, Inc.*, 9 A.D.2d 473, 195 N.Y.S.2d 179 (1959)).

**81.** Viacom Post–Tr. Reply Br. at 32 n. 26 (citing New York cases).

**82.** *Guard-Life*, 428 N.Y.S.2d at 631, 406 N.E.2d at 448 (quoting Restatement (Second) of Torts § 766 (1977)).

**83.** *See, e.g.,* Guarantee (binding "successor Participants").

**84.** MCA Post–Tr. Reply Br. at 16–23. MCA earlier asserted such a claim against Eighth Century Corp. They do not press the claim in their

post-trial briefs and so I do not address it. It should further be noted that throughout the briefing the distinction between Viacom Inc. and Viacom International becomes blurred—a highly contagious side effect of participation in this litigation that I have tried to avoid.

**85.** Viacom Post–Tr. Reply Br. at 46.

**86.** *Id.* at 47–50.

**87.** *See In re Arthur Treacher's Fish & Chips*, Del. Ch., 386 A.2d 1162, 1166 (1978).

**88.** Guarantee ¶ 3.

legal participant in the Venture (Eighth Century) is a shell subsidiary.[89] Because the entity performs no other function than to hold its parent's interest in the Venture, the controlling entity must assume its obligations.[90] Viacom International, as the parent of Eighth Century, must therefore take on Eighth Century's duties. The relationship between Viacom International and Viacom Inc., however, is not similar.[91] Perhaps that is why plaintiffs' amended complaint couches Viacom, Inc.'s purported liability in terms of aiding and abetting Eighth Century's and Viacom International's breach of their fiduciary duty.[92] Any such claim requires the existence of a fiduciary duty, a breach of that duty and a knowing participation in the breach by the non-fiduciary defendant.[93]

MCA claims that the absolute obligation of loyalty that fiduciaries owe to one another prohibits one of those partners from actually or potentially competing with the partnership.[94] It is alleged here that Viacom's MTV Networks compete with the USA Networks for viewers, advertising revenue, programming, channel space and position, and ideas. Viacom's counter argument is *not* that there is *no competition* between the network groups, but that the competition is so diffuse or indirect, that no harm has been or can be shown. Viacom further argues that to the extent MCA contends there is a likelihood of future harm, its contention is purely speculative and therefore legally deficient.[95] It is not, therefore, the fact of competition that Viacom challenges, but the significance of it. The difficulty with this argument is that injury is not required to prove the breach.[96] Thus, what is important

in determining whether there has been a breach of fiduciary duty by the defendants is whether action inconsistent with their obligations has been taken, not the effects of the action.

Here, the evidence is overwhelming that defendants' current holdings consist of national, video, advertiser-supported basic cable networks—a direct conflict with the non-compete provisions of the USA agreements. These facts constitute a breach of the agreements and the expression of the scope of fiduciary duties within the agreements. Viacom Inc.'s control of Paramount and Viacom International and its determination to merge the two with knowledge of the pre-existing Paramount agreements constitutes aiding and abetting the continuing breach by Viacom International. Defendants do not seriously contest the facts that support this conclusion but argue instead that the conflict minimally affects the USA Networks and the joint venture, and that their several affirmative defenses must defeat plaintiffs' claims. I do not believe a further detailed discussion of the facts supporting a breach or absence of breach by any party, beyond the background facts set forth above, is necessary. The parties and their predecessors in interest intended to define the participants' duty of loyalty to each other and to the Venture partnership within the non-compete or covenant not to compete clause. As such, I need not discuss the issue of any independent breach of common law fiduciary duty. All of the parties' respective contentions concerning the scope of the duty, the existence of a breach of duty, the effect of the breach, the nature of the harm suffered by the USA Networks, and who bears re-

---

89. See Viacom Op. Post–Tr. Br. at 64–65 n. 32.

90. *See Geyer v. Ingersoll Pubs. Co.*, Del. Ch., 621 A.2d 784, 793 (1992) (citing *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, Del. Ch., C.A. No. 8578, Berger, V.C., 1990 WL 44267 (Apr. 12, 1990)).

91. *See J. Royal Parker Assocs., Inc. v. Parco, Brown & Root, Inc.*, Del. Ch., C.A. No. 7013, Berger, V.C. (Nov. 30, 1984), Mem. Op. at 4, 1984 WL 8255 (more than mere control (*i.e.* fraud or shell status) must be shown before disregarding separate legal entities).

92. MCA Amended Complaint at ¶ 59.

93. *See In re Santa Fe Pacific Shareholder Litig.*, Del.Supr., 669 A.2d 59, 72 (1995).

94. MCA Post–Tr. Reply Br. at 19 (citing *Guth v. Loft*, Del.Supr., 5 A.2d 503, 510 (1939); *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 541 N.Y.S.2d 746, 748, 539 N.E.2d 574, 576 (1989)).

95. Viacom Post–Tr. Reply Br. at 46–53.

96. *See Cede & Co. v. Technicolor, Inc.*, Del.Supr., 634 A.2d 345, 371 (1993).

sponsibility as a result, can and should be discussed within the framework crafted by the parties themselves—the non-compete clause and associated provisions of the contractual relationship.

I conclude that the significance of harm or even benefit to the Venture resulting from this conflict is more appropriately addressed within the construct of a remedy. Equity can provide an appropriately tailored remedy for any breach of the parties own agreed or assumed contractual definition of the duty of loyalty found in the covenant not to compete. I turn now, therefore, to Viacom's affirmative defenses.

### D. Viacom's Affirmative Defenses

Viacom raises two affirmative defenses to any finding of breach of contractual or other duties, to which it has devoted substantial briefing effort. The first of these concerns the events of the 12th February meeting between Redstone, Dauman and Bronfman. The second concerns possible anti-trust implications of the non-compete in the Agreement. I address these in turn.

**1. The 12th February Meeting:** A more complete account having been set forth in Part II, above, I recount only the significant circumstances of the meetings briefly here: At the Friday, 9th February meeting of the principals, Redstone thought it possible he would release Biondi from the terms of his non-compete if Bronfman would waive any claims against Viacom concerning TV Land. Bronfman agreed the two (he and Redstone) should consider things over the weekend. On Monday, 12th February, in Redstone's office and with Dauman, all agree that at the end of their meeting Bronfman said, in response to a question from Dauman, that MCA would not litigate with respect to "MTV" and Redstone would release Biondi in thirty days. Since shortly thereafter, however, the parties have disagreed over the length of time devoted to which discussion subjects, the precise words spoken, the sequence of events, and perhaps not least, the seating arrangements during the meeting.

All participants knew Bronfman and MCA to be represented by legal counsel and that MCA's counsel was not present during the discussions. What is clear is that both sides left the meeting with the understanding that further action was necessary to complete their respective understandings: Redstone was obliged to release Biondi, and Bronfman was obliged to provide a waiver or release of claims with respect to TV Land (as he understood it) or the MTV Networks (as understood by Redstone and Dauman). As the preliminary drafts of the MCA waiver began to circulate, it quickly became apparent there was no agreement on the scope of the waiver. Presumably because the parties were unable to reach an agreement or accommodation, Biondi was not released at the end of thirty days.

Viacom claims the parties' discussions on 9th and 12th February led to a binding agreement. As such, Viacom claims that any and all causes of action MCA might ever have had against Viacom related to the USA Networks were waived at the end of the meeting on 12th February. Viacom and MCA both raise a slew of legal citations purporting to resolve their dispute over the consequences of the meetings by legally categorizing their discussions as one form of agreement or another. But before reaching any of the finer legal distinctions, the first question to be answered is whether it is reasonable to conclude, as I must, that the parties, Bronfman and Redstone (MCA and Viacom) intended to be legally bound by the oral assents occurring at the end of their 12th February meeting.[97]

■ Whether the respective "promises" by Bronfman and Redstone were to have occurred then or in the future, whether MCA's claims regarding the MTV Networks were "disputed" or "undisputed" as of that day, whether the "agreement" reached would constitute an oral accord and satisfaction or fall within some other category, it is simply unreasonable to conclude that either Bronfman or Redstone (or Dauman for that matter) intended then and there to bind their

**97.** *See Consarc Corp. v. Marine Midland Bank N.A.,* 996 F.2d 568, 576 (2d Cir.1993) (intent to

be bound is question for the factfinder).

respective conglomerates to a multi-billion dollar agreement.

■■■ In *R.G. Group, Inc. v. The Horn & Hardart Co.*, the Second Circuit elaborated a non-exclusive list of factors to consider when examining oral business agreements.[98] Though no single factor should be considered determinative, first and most obvious is the expression of the parties. Here, of course, there is no dispute that Bronfman expressed his agreement. Secondly, performance (full or partial) is an additional signal of the parties intent to be bound (or not) by their oral agreement. I find no evidence of performance by either party in this instance. It is certainly true that Redstone did release Biondi, but he did so many weeks later and after it was clear no agreement on the waiver would be reached. More importantly, Redstone's letter releasing Biondi makes clear that his release is not conditioned upon or considered performance of the agreement.[99]

■■■ A further consideration is the conclusiveness of the allegedly binding oral agreement.[100] In this instance, it is clear that although Biondi's release was straightforward, the definitive terms of the MCA waiver could not have been. The issue highlights an important policy requiring particular caution when considering enforceability in this context.

> [T]here are often forceful reasons for refusing to make a binding contract unless it is put in writing. The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing. These considerations are not minor; indeed, above a certain level of investment and complexity, requiring written contracts may be the norm in the

business world, rather than the exception.[101]

The above quotation points up several important considerations here. The parties' efforts to draft a mutually acceptable waiver immediately brought significant differences to light. Of course, this included the fundamental difference of whether the waiver was to be solely related to TV Land or all the MTV Networks. But further differences also surfaced including current brand extensions, future brand extensions, and continuation of the non-compete generally. These were, by any account, discussed in a cursory manner or not discussed at all. I am further persuaded by the existence of writing requirements in the other agreements related to the Venture.[102] Whether the waiver would constitute an amendment to the Guarantee and/or the Agreement, or a separate agreement, the fact remains that all other agreements concerning the Venture were reduced to writing.

In sum, the parties reached common ground—they took steps toward a resolution of their dispute—but the only conclusion I can reach is that they reasonably understood and expected the need for all legal ramifications of what had been agreed to be confirmed in writing by their legal representatives. I cannot conclude people operating under long-extant written contracts defining their rights and obligations as partners to a joint venture valued at several billion dollars, could have reasonably expected brief Monday morning meetings to bind their corporations evermore. This conclusion is reinforced by the absence of any claim that any party took a substantial step to their detriment in the interim.

■■■ **2. Anti-Trust and Public Policy Defenses:** Viacom claims that section 7.01 of the Agreement is an illegal restraint on competition in violation of federal and state anti-

---

98. 751 F.2d 69, 74–76 (2d Cir.1984). *See also Philips Credit Corp. v. Regent Health Group, Inc.,* 953 F.Supp. 482, 510–11 (S.D.N.Y.1997) (discussing factors in greater detail).

99. *See supra* note 57.

100. *R.G. Group,* 751 F.2d at 76.

101. *Id.* at 75.

102. While it is true that the Guarantee does not contain an express provision requiring amendment by a writing, having previously concluded the Guarantee includes the relevant provisions of the Agreement, this clause would be so included. *See* JVA2 Art.XV.

trust laws,[103] as well as "antithetical to the strong public interest in favor of competition."[104] Before directly addressing the specificities of these defenses, I consider whether an anti-trust defense is properly raised.

The United States Supreme Court has often expressed the disfavor with which anti-trust defenses to contract actions are viewed.[105] The New York Court of Appeals has adopted the same stance.[106] On the sole occasion the Delaware Supreme Court has addressed the question, while it did not enunciate a policy, its holding cited *Kelly*, and other cases expressing disfavor with the defense, with approval.[107]

 The policy underlying this disfavor is expressed in similar terms regardless of juridical venue. That is, as a general proposition, a party having received the benefits of its contract, ought not in the usual circumstances to turn to the court in an effort to escape its concomitant obligations.[108] Stated differently, 'the policy of not furthering the [alleged anti-competitiveness] is less important than the policy of preventing people from getting other people's property for nothing when they purport to be buying it.[109]

Admittedly, this is not a sale of goods case. But the underlying principle is the same. Since the start of the Venture, and with very minor and infrequent exception, the parties to it have abided by the provisions of the

Agreement and its section 7.01. When this created some difficulty, the difficulty was resolved either by the party's exit from the Venture, or a narrowly and carefully constructed exception. It has been the efforts of the parties and their willingness to abide by their agreements that has led to the remarkable success of the USA Networks. Viacom may have stepped into the shoes of an original participant, but its ownership of the MTV Networks fundamentally changes the relative position of the coventurers. One of the original parties, Paramount (in its new form of Viacom International), has now got the best of both worlds; an immensely successful cable venture to which it was able to and did devote its exclusive efforts, and now too a group of wholly-owned cable networks. Yet MCA remains in its original position. To allow Viacom International (as Paramount incarnate) to reap the benefits of this structure at MCA's expense would be inequitable.[110]

 This does not, however, fully answer the question, because the defense may nevertheless be upheld where the contract is "intrinsically illegal",[111] or where "enforcement would result in compelling performance of the precise conduct made unlawful by the anti-trust laws." [112] I note initially, that I do not find section 7.01 to be violative *per se*, and thus consider the provision under the

---

103. New York's anti-trust statute, the Donnelly Act, "should generally be construed in light of Federal [sic] precedent and given a different interpretation only where State [sic] policy, differences in the statutory language or the legislative history justify such a result." *People v. Rattenni*, 81 N.Y.2d 166, 597 N.Y.S.2d 280, 282, 613 N.E.2d 155, 157 (1993) (internal quotations omitted). Delaware's Antitrust Act similarly provides by statute. *See* 6 Del C. § 2113 (1993). Finding no reason to do otherwise, I analyze Viacom's federal and state anti-trust defenses collectively.

104. *See* Viacom Post–Tr. Br. at 67–68.

105. *See Kelly v. Kosuga*, 358 U.S. 516, 518, 79 S.Ct. 429, 430, 3 L.Ed.2d 475 (1959); *see also Viacom Int'l, Inc. v. Tandem Prods., Inc.*, 526 F.2d 593 (2d Cir.1975) (collecting and discussing U.S. Supreme Court cases).

106. *See X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 611 N.Y.S.2d 786, 789, 634

N.E.2d 158, 161 (1994) (citing *Kelly* and *Viacom Int'l* ).

107. *Polycast Technology Corp. v. Rohm & Haas Co.*, Del.Supr., 305 A.2d 323 (1973).

108. *See Viacom Int'l*, 526 F.2d at 599.

109. *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 270–71, 29 S.Ct. 280, 295–96, 53 L.Ed. 486 (1909) (Holmes, J., dissenting).

110. *See also X.L.O. Concrete*, 611 N.Y.S.2d at 790, 634 N.E.2d at 162 ("the equities of the parties must be examined").

111. *Polycast Technology*, 305 A.2d at 324.

112. *X.L.O. Concrete*, 611 N.Y.S.2d 786, 634 N.E.2d at 161 (citing *Kelly*, 358 U.S. at 520, 79 S.Ct. at 431).

"rule of reason" analysis.[113] This rule "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." [114]

 Whether I consider the requirements of section 7.01 in light of the cable industry today (as Viacom urges),[115] or at the time of adoption, makes little difference for the simple reason the effects of section 7.01 are anti-competitive in only the most *de minimis* manner. I do not agree with Viacom's contention that section 7.01 is output reducing: It is output channeling, but not reducing. Any party is free to establish any otherwise prohibited operation through the Venture. Moreover, in the event one partner is against just such a proposal, the practice of the parties has been to allow individual operation.[116] Indeed, since this dispute has arisen, the parties have talked about additional opportunities for the Venture.[117] More importantly, should one of the parties find the terms too onerous, it may sell its interest to a third party (or to its partner at the same price).[118]

The only anti-competitive effect of section 7.01 is that it restricts Viacom's ability to compete as it wishes. Viacom would prefer to continue to operate its MTV Networks (and develop new channels) and continue its one-half ownership in the USA Networks. Section 7.01 flatly prohibits this conduct. This does not make the section anti-competitive—much less violative of the anti-trust laws. While it may be true that Viacom is an important force in the cable television and related industries, this does not mean that the anti-trust laws, or public policy, require it to be able to operate as it wishes and without regard to agreements by which it is bound.

Nor does it follow that if Viacom is unable to escape the prohibitions of section 7.01 that cable television, or any more particularly described market, will suffer any harm. Despite the spaghetti-like lines of ownership prevalent in the industry,[119] no evidence was adduced at trial tending to show any result other than Viacom would be better served strategically and economically if it need not comply with the non-compete.[120]

---

113. See *BMI v. CBS*, 441 U.S. 1, 7–8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979) (That is, it is not "plainly anticompetitive and ... lack[ing] ... any redeeming virtue") (citations omitted). While Viacom argues section 7.01 is output reducing, and such provisions often fall under the *per se* rubric, I find no evidence of any reduction in output on the record before me. Indeed, it is at least in part because Viacom has felt entirely unrestrained that the case is before me. In any event, where there are pro-competitive justifications for an alleged restraint (here, among others, protection from divided loyalties of powerful parents), analysis under the rule of reason is appropriate. See *NCAA v. Board of Regents*, 468 U.S. 85, 100–01, 104 S.Ct. 2948, 2959–60, 82 L.Ed.2d 70 (1984) (rule of reason analysis appropriate in considering agreement limiting number of televised games where necessary for product to be available). Regardless of the analysis employed, the ultimate objective is to test the "competitive significance" of the challenged provision. *Id.* at 103, 104 S.Ct. at 2961 (citation omitted).

114. *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 342–43, 102 S.Ct. 2466, 2472–73, 73 L.Ed.2d 48 (1982).

115. Viacom Post–Tr. Reply Br. at 34–36.

116. *See* Tr. 405 (MCA would not act like a "dog in the manger" where it did not wish to pursue an idea through the Venture).

117. Tr. 1723–28.

118. *See* JVA2 Art. VII.

119. *See* V–733.

120. Viacom complains throughout its briefs that if MCA prevails it will be forced to sell its interest in USA Networks at "a price well below fair market value." *See, e.g.,* Viacom Post–Tr. Br. at 90. Nothing in the record convinces me this is true. The buy-sell mechanism, even assuming it was triggered by Viacom, allows an independent investment bank to set a fair market value for the Venture. There is no reason to conclude the existence of a wide disparity in the buy-sell offers, assuming the initiating offer to have been reasonably calculated. Alternatively, should Viacom wish to sell its interest to a third party, MCA may only preempt the sale by purchasing on the same terms. Viacom's tax burden may be significant since it claims to carry its interest at book value. But this has nothing to do with fair market value. While the tax consequences may be severe, given the resources the parties are able to bring to bear on the issue, I see no reason why a sale under either of these scenarios could not be structured to at least minimize tax liability.

As a matter of policy, leaders in industry must be encouraged to pool their resources without fear that they run the risk of having the conditions changed when they no longer serve the purposes of their coventurers. It may well be true that one or the other or all of the coventurers will eventually determine the rules of the game ought to be changed. At such time, the parties must operate within their previously agreed guidelines or otherwise by mutual agreement. A court of equity will not step in to alter the playing field to the distinct disadvantage of one over the other.

**3. Equitable Defenses:** Viacom has raised the equitable defenses of laches and "unclean hands." The short and easy answer to the first of these defenses is that the tolling agreements, both of which are still in place, expressly preclude Viacom's assertion of this defense.[121] The initial agreement was signed in April of 1994, almost immediately following the Viacom–Paramount merger. It covers "any suit or other proceeding ... relating to the USA Network Agreement" and provides that "neither party will assert the period between March 1, 1994 and the expiration date ... in the calculation of any period of limitations or in the determination of whether the suit or proceeding is barred by laches or any other legal or equitable defense based on the passage of time." [122] The second tolling agreement, similarly covers claims related to TV Land.

As to the second of these defenses, I find that MCA has not engaged in any improper conduct regarding the Venture. The two instances cited are MCA's announcement of an European action/adventure channel, and Seagram's shareholdings in Time, Inc. Even assuming the European channel begins operations, the language of section 7.01 clearly limits its application to the domestic cable market. MCA's activities in this area are not prohibited either by the Agreement or broader fiduciary notions.[123]

Nor do I find anything violative or otherwise improper concerning Seagram's minority interest in Time. While nothing in the agreement defines what constitutes "directly or indirectly ... engag[ing]" in prohibited operations that violate section 7.01, the definition of "Affiliate" is instructive. As noted above, this definition turns on the exercise of control. While it must certainly be true that control is a higher standard than indirectly engaging, surely some form of active participation must be shown before one can be considered to be engaged. Seagram's stake is significant, particularly given the size of Time, but nothing in the record indicates that Seagram is in any way an active participant in Time, much less one of Time's entertainment subsidiaries. As such, there is no basis from which I could conclude that Seagram is engaging, directly or indirectly, in a business prohibited by section 7.01.

**IV. Viacom and Eighth Century's Complaint**

Viacom Inc. and Eighth Century Corporation filed a separate complaint against The Seagram Company, Ltd., MCA, Inc. and Universal City Studios, Inc., requesting equitable relief and damages on the basis of defendants' breach of fiduciary duty, breach of contract and tortious interference with contractual relations, and for a declaration Viacom did not violate the 1981 joint venture agreement governing the operation of the USA Networks partnership. Viacom Inc.'s and Eighth Century's claims essentially focus on a pattern of unfair dealing intentionally pursued by MCA and Seagram calculated to force Viacom and its affiliates out of the USA Networks under disadvantageous terms. The facts found and the analyses flowing from them in the earlier discussions of fiduciary duty, the terms of the agreements, and the resolution of Viacom's affirmative defenses, demonstrate the inconsistency between findings that could remotely support Viacom's claims and the conclusions reached above. Viacom's attempts to refocus this case outside the terms of the agreements by

---

121. M–369, 370.

122. M–369 at ¶ 1.

123. *See Cooper Devel. Co., supra,* 1994 WL 62846 at *5 (broad notions of fiduciary responsibility will not override express provisions of agreement).

characterizing MCA's efforts to enforce its rights under the agreements as pretextual manipulations rising to the level of unfair dealing are, quite simply, entirely specious. Separate and distinct but repetitious findings are not required to make the Court's position clear. The findings and the analyses articulated above are equally inconsistent with these plaintiffs' request for a declaratory judgment. On Viacom and Eighth Century's complaint, I find for the defendants.

## V. Summary of Legal Argument

In summary, defendants [124] fail to convince me as a matter of law or fact either that any of their asserted affirmative defenses apply or that they are entitled to prevail on their claims against the plaintiffs. I further conclude plaintiffs [125] have established (a) a breach of the contractual covenant not to compete by Eighth Century and Viacom International; and, (b) a breach of the fiduciary duty of loyalty implied in the terms of the covenant not to compete by Eighth Century and Viacom International, aided and abetted by Viacom Inc. Plaintiffs are entitled to an appropriately tailored equitable remedy.

I turn now to the heart of the resolution of this dispute—the appropriate equitable remedy for the breach in light of all of the circumstances established at trial.

## VI. The Remedy

I have concluded and declared that defendants Eighth Century and Viacom International are (a) in breach of the joint venture Agreement and of the Paramount Guarantee; (b) in breach of their fiduciary duties to plaintiffs as defined by the agreements, and that Viacom Inc. aided and abetted those breaches. The thrust of the majority of plaintiffs' claims for relief focuses on elimination of the continuing disloyal competition of their partner in the USA Networks venture.

■ As a result of these findings and conclusions, I now consider the remedies requested: injunctive relief, including mandatory, permanent injunctive relief, specific performance of the agreements and an accounting. These are mechanisms which may be designed to eliminate the competition of a disloyal partner and remove the offending partner from the venture. They may be crafted within the form of an order for specific performance or for injunctive relief. All parties argue the relative consequences to each side of a failure to immediately remedy the breach and the hardship that would be caused by a sweeping draconian approach to remedying the breaches. Four important facts became clear to me early in this litigation:

(1) USA Networks is an extremely well run and profitable enterprise;

(2) No exigencies existed, in fact, requiring a rush to judgment in order to avoid catastrophic economic consequences to any party; [126]

(3) Continuation of the present circumstances was an untenable situation; and,

(4) Once the legal disputes between the parties were resolved by this Court, removing the makeweight arguments impeding settlement, business people should decide in an atmosphere free of legal obstruction how to restructure or dissolve the USA Networks venture.

While I certainly recognize the findings and conclusions of this opinion markedly affect the legal positions of the parties, I retain wide discretion in fashioning an appropriate remedy. I view the appropriate initial policy considerations analogous to those for dissolution of a joint venture corporation under our General Corporation Law. The USA Networks, which of course I recognize to be a New York partnership, will be radically altered from its present form by any final order of judgment ultimately entered by this Court. The parties should have a reasonable time to respond to the findings contained in this opinion and to participate in a meaning-

---

**124.** Defendants in C.A. 14971; plaintiffs in C.A. 14973.

**125.** Plaintiffs in C.A. 14971; defendants, with others, in C.A. 14973.

**126.** Conspicuous by her absence at trial, Kay Koplovitz, USA's CEO, the person charged with acting in the best interests of the USA Networks, never decried the actions of any party to this litigation in any plaintive way.

ful way in the fashioning of an appropriate remedy. I therefore order the parties to submit an agreed upon plan for discontinuance of the USA Networks venture in its present form, taking into account the legal and factual conclusions of this Court. The plan should provide for disposing of the assets used in the venture, if appropriate, and be submitted within thirty (30) days of the filing of this opinion. If the parties do not agree, and therefore cannot file such a plan certifying agreement, each party's respective plan of discontinuance shall be filed with the Court within forty-five (45) days of the filing of this opinion. In the interim, I will hold in abeyance MCA's requests for injunctive relief, specific performance, an accounting, costs and attorneys fees, assuming the plan or plans filed will encompass the facts and conclusions relevant to their application and inclusion in a final order.

Judgment entered for the plaintiffs and against the defendants in the interim in C.A. 14971 and for the defendants and against the plaintiffs in C.A. 14973 subject to further order of the Court.